W. H. McINTOSH, as Receiver of Mohall State Bank, Mohall, North Dakota, an Insolvent Corporation, Respondent, v. DAKOTA TRUST COMPANY, a Corporation, Appellant.

---

W. H. McINTOSH, as Receiver of Mohall State Bank, Mohall, North Dakota, an Insolvent Corporation, Respondent, v. THE AMERICAN SURETY COMPANY OF NEW YORK, et al., Defendants. THE AMERICAN SURETY COMPANY OF NEW YORK, Appellant.

(40 A.L.R. 1021, 204 N. W. 818.)

**Banks and banking — bank directors should procure and file surety bonds insuring their own fidelity as officers and employees of bank.**

1. It is the duty of the board of directors of a bank to procure and file with the State Banking Department a satisfactory surety bond insuring their own fidelity as officers, and, if they themselves be employed by the bank, as employees of the institution. Comp. Laws, 1913, §§ 5150 and 5181.

**Banks and banking — bank taking part in procuring bond for employees by answering questions has duty to disclose any knowledge of defaults.**

2. When a banking corporation requires a bond of an employee, it may take

---

Note.—(3) Authority to act for corporation implied from prior exercise of power, see 7 R. C. L. 623; 2 R. C. L. Supp. 418; 4 R. C. L. Supp. 492; 5 R. C. L. Supp. 415.

(5) Effect on liability of surety on fidelity bond of concealment and misrepresentations of employer, see annotation in 40 A.L.R. 1036; 3 R. C. L. 485.

part in procuring a satisfactory bond to the extent of answering questions as to the employee's record in the existing employment, and in answering such questions it is its duty to disclose correctly, if it assumes to comply with such request for information, any knowledge it may have of past or existing defaults. Giving such information, in the name of the bank, as to the record of the employee in the existing employment, is violative neither of the statutes nor of public policy.

**Banks and banking — bank officers, accustomed to give information as to record of employees to prospective sureties, held justified in believing they had authority; authority to act for and bind corporation may be presumed from acts of recognition in other instances.**

3. Actual authority is such as the principal intentionally confers upon the agent, or intentionally or by want of ordinary care allows the agent to believe himself to possess. Comp. Laws, 1913, § 6337. Where for a period of six years, it had been customary for officers of a bank to give information to prospective sureties as to the record of employees in existing employments, without objection or protest by the corporation and under circumstances necessarily imputing notice of the custom to the corporation, such officers were justified in believing that they had authority to give such information. Authority to act for and bind a corporation may be presumed from acts of recognition in other instances when such power was in fact exercised.

**Banks and banking — surety held entitled to benefit of authority from bank to officers to give information concerning bonded employees; surety may show custom for officers to exercise authority.**

4. The inference of actual authority, from the conduct of the corporation towards its officers and agents, is one of fact; the surety company is entitled to the benefit of this inference notwithstanding it may have been without knowledge of the usage at the time it wrote the bond. The surety may, in order to establish actual authority in the officers to execute the employer's statement, prove that it had been customary for such officers to exercise the identical authority in circumstances warranting the inference that the corporation knowingly acquiesced therein.

**Principal and surety — if concealments and misrepresentations for which employer is responsible, affect surety's liability, sureties are released.**

5. When concealments and misrepresentations, for which an employer is responsible, are directly related to the transaction to which the suretyship will attach, and affect the liability of the surety in material respects, the sureties are released from liability on the bond.

**Banks and banking — banking corporation held bound by false representations by bank officers.**

6. A banking corporation is liable to innocent third persons where the representation is made in the course of its business and by an agent while

52 N. D.—48.

acting within the general scope of his authority, even though, in the particular case, he is secretly abusing his authority and attempting to perpetrate a fraud upon his principal, or some other person, for his own ultimate benefit. In such a case, the bank is chargeable with the knowledge of its agents, and the exception to the rule of imputed knowledge does not apply.

**Banks and banking — suit on fidelity bonds of bank employees held equivalent to assertion that contracts were made in behalf of, and authorized by bank.**

7. By bringing suits on the bonds, the receiver of the bank treats them as having been acceptable to the bank and as binding on the sureties, and, in effect, asserts that the contracts were made in behalf of and authorized by the bank.

Opinion filed June 6, 1925.

Agency, 2 C. J. § 202 p. 560 n. 61, 64. Banks and Banking, 7 C. J. § 124 p. 524 n. 12, 22 New; § 130 p. 526 n. 50, p. 528 n. 52, 55 New; § 131 p. 529 n. 61; § 132 p. 530 n. 69, 69 New; § 134 p. 530 n. 71, p. 533 n. 85, 86; § 136 p. 534 n. 93; § 142 p. 539 n. 29, p. 540 n. 30. Bonds, 9 C. J. § 29 p. 19 n. 93, 94; § 221 p. 120 n. 40. Corporations, 14 C. J. § 2212 p. 349 n. 48, p. 350 n. 49. Fidelity Insurance, 25 C. J. § 15 p. 1104 n. 74, 77; p. 1105 n. 78, 79, 81 New. Principal and Surety, 32 Cyc. p. 59 n. 45; p. 62 n. 85.

Appeal from judgment for Plaintiff, District Court, Renville County, North Dakota, *Buttz, J.*

Reversed.

*A. W. Fowler* and *Pierce, Tenneson, Cupler & Stambaugh,* for appellant, Dakota Trust Company.

*Lewis & Bach,* for appellant, American Surety Company.

*Francis Murphy* and *J. J. Weeks,* for respondent.

JOHNSON, J.   Three actions were brought by the receiver of the Mohall State Bank on as many separate fidelity bonds, one executed by the American Surety Company, and two by the Dakota Trust Company, as sureties, for one Bergman, the cashier, Peters, the president, and Wiebe the vice-president of the bank. The bonds are similar, but not identical. The actions were consolidated and by stipulation tried and appealed together.

One Bergman, at that time cashier of the Mohall State Bank, hereinafter referred to as the bank, applied to the American Surety Com-

pany for a bond in the sum of $10,000, to run for a period of one year. Peters as president of the bank, upon request from the surety company, furnished a certificate stating certain facts pertaining to the record, character, and the condition of the accounts of the applicant for the bond. Peters testified that he made the statement in behalf of the bank. It is urged by this defendant that the certificate was the actual basis of the bond, and the inducing cause for its execution. This instrument, generally identified in the record as the employer's certificate, is dated March 18, 1920, and recites that Bergman has been employed by the bank for five and one half years, and has performed his duties, to the best knowledge of Peters, in a faithful and satisfactory manner; that his accounts were last examined on January 1, 1920, and found correct in every respect; that he was not in arrears in the employment; that he is "entitled to confidence and qualified to discharge the duties of the position named in the application. Proper accounts are kept and adequate examinations of his transactions will be made." These statements were false in every material detail.

A condensed financial statement of the bank, at the close of business on February 28, 1920, was submitted to the American Surety Company with the application for the bond. This statement showed a surplus fund of $25,000, and undivided profits of $8558.21. According to the testimony of Peters, this was "really an absolute fabrication." It was likewise shown in this statement that the bank had real estate worth $7,500. This was likewise false; there was no value there whatever.

The bond of the American Surety Company indemnifies the bank against loss due to fraud, dishonesty, theft, embezzlement, wrongful abstraction, or willful misappropriation on the part of the employee, "of funds or personal property." It is stipulated that the suretyship shall end "(a) with the date of the discovery by the employer either of loss hereunder or of dishonesty on the part of the employee, or (b) with the date of the dismissal of the employee from the service of the employer, or (c) with the date of determination of suretyship by the surety or the employer in the manner hereinafter set forth in Clause 7."

The American Surety Company denies liability on the ground that the answers in the employer's certificate as to the character and the

condition of the accounts of the insured, and the statement as to the condition of the bank, were grossly false and materially affected the risk, contending that the bond never became operative, because the dishonesty of the employee, Bergman, was fully known to the Bank at the time the instrument was signed, and that Bergman's embezzlements were fraudulently concealed from the surety.

In the actions against the Dakota Trust Company on the bonds of Wiebe and Peters, the employer's certificates, purporting in each instance to be made by the bank, gave more detailed information. In each case, the certificate unequivocally asserted, as a fact, that the applicant had correctly kept his accounts and "made proper settlement of all cash and other property entrusted to his care;" that his books and accounts had been personally "inspected and audited by the board of directors and all money and valuables reported as due, on hand or in bank, examined and verified," on June 2, 1920, in the Wiebe case, and in January, 1920, in the Peters case; that when such examination and auditing took place, the accounts were in "every respect" correct; that the insured was in no manner indebted to the bank, and was not in default under a previous bond. The blank certificates were mailed directly to the bank, the answers were certified in its name, in the Wiebe case by Peters as president, and in the Peters case, by Bergman, as cashier, and the premiums on the bonds were paid by the bank.

The material conditions of the bonds of Wiebe and Peters are substantially as follows:

No. 3. If the employee has defaulted at any former period, to the knowledge of the employer at the time of the execution of the bond, the bond shall be void and no recovery shall be had thereunder.

No. 6. If, at any time after the bond is written, the employer, or any officer of the employer, acquires knowledge or notice of any act, fact, or information tending to show that the employee is, or may be, unreliable, deceitful, dishonest or unworthy of confidence, the employer shall immediately give the surety notice of such fact, and the surety shall not be liable for any act of the employee thereafter committed; if, at any time after the beginning of the term for which the bond is written, the employer acquired knowledge of the fact that the employee is unreliable, deceitful, dishonest or unworthy of confidence, the surety shall not be liable for any act of the principal thereafter committed.

No. 7. All written statements and declarations concerning the employee or his duties or acts made to the surety company by the employer, or any officer of the employer, at or before the execution of the bond or any renewal thereof are "hereby made the basis of this bond, as to the employee and are each, every and all warranted by the employer to be true"; if any of such statements or declarations be false in any particular, or if any suppression or misstatement has been made of any fact affecting the risk at any time, the surety shall not be liable under the bond.

No. 14. The receipt and retention of the bond, or the making of claim for any loss thereunder by the employer, shall be construed as a covenant on the part of the employer consenting and agreeing to all the terms, provisions and conditions therein; and that the employer will make frequent audits and examinations during the term of the bond, take and use all reasonable steps and precautions to prevent any act on the part of the employee which would tend to give rise to liability under the bond.

The Wiebe and Peters bonds are executed upon the foregoing express conditions and indemnify the bank on account of loss due to the "personal dishonesty amounting to larceny or embezzlement of the employee."

The undisputed testimony shows that both surety companies relied on the employer's certificates and the statement of facts therein contained; and that each certificate was grossly false in every substantial detail. The statement, purporting to show the financial condition of the bank, furnished the American Surety Company was likewise false. Both Wiebe and Peters were indebted to the bank in sums aggregating thousands of dollars; no examinations whatsoever of records, vouchers, or books of account had in fact been made; both were in default under prior bonds; and all three, for two years had been and were, when the statements were made, actively engaged in embezzlement operations on a large scale. On the date of the financial statement there was neither surplus, nor undivided profits, the capital was wholly impaired, and there was no equity in real estate held in the name of the bank.

From 1918 or 1919 until the bank closed, in November 1920, the major portion of the capital stock was owned by Peters, Wiebe and Bergman; from June 16, 1920, they owned 80% of the capital stock;

the remaining 20% was scattered, one share to a person. During all this time they were directors of the bank, and after June 2, 1919, they constituted the entire membership of its board of directors, and were in sole charge of the institution. At all times thereafter these men had complete control of the bank, managed it to suit themselves, and used its funds and its credit in aid of their personal business ventures. Before the bank closed, they had embezzled its assets much in excess of the obligations of the bonds involved in the consolidated actions. A special account was kept on the books in the name of Peters, through which they financed their operations in real estate, using the bank as necessary in furtherance of their schemes. A condensed statement of the larger items discloses embezzlements exceeding $118,000.00. Liberty Bonds, of the value of over $18,000.00 were abstracted by the officers and distributed in approximately equal shares. These frauds continued until the bank closed. All three pleaded guilty to charges preferred under U. S. Statutes, and were committed to a Federal penitentiary.

The Dakota Trust Company in the Wiebe and Peters cases contends: 1. That the bonds never became effective because of the fraud of the bank in withholding from the surety the knowledge, possessed by the board of directors, that the bonded employees were dishonest. 2. That the employer's statements are expressly made warranties and conditions precedent to liability; that such warranties were broken and that, therefore, the last continuation certificate never became effective or binding upon the Dakota Trust Company. 3. That the bank in one of the conditions of the bond expressly obligated itself to notify the surety when the dishonest acts of the bonded employees became known to it, or to any of its officers, and that inasmuch as the bank broke this condition and failed to notify the Dakota Trust Company of the dishonest acts of the officers and employees, known to all its directors and managing officers, before the last continuation certificate was issued as well as afterwards, the surety company is relieved from liability for all future acts of dishonesty and that, therefore, there is no liability.

The Peters bond was first written on January 5, 1914, and thereafter, from year to year, kept in force by means of continuation certificates. It is provided in every renewal that the bond is continued subject to all the covenants and conditions of the original instrument.

The Wiebe bond was first executed on June 23, 1919, and the continuation certificate in that case is dated June 26, 1920.

The parties entered into the following stipulation at the time of the trial:

"It is stipulated and agreed in each case that plaintiff is not entitled to recover in these actions prior to the period covered by the last continuation of each bond, and that the recovery of plaintiff, if any, is limited to the last continuation certificate, issued by the Dakota Trust Company."

"It is further stipulated and agreed that to expedite the trial of said three actions the same shall be tried together and that all evidence offered by any of the parties in any of said actions at this trial shall be taken and considered as having been offered and introduced in each of said actions and shall be considered by the Court at the trial and in the Supreme Court as having been offered in the particular action under consideration so far as the same may be material or relevant to the issues thereof."

The receiver, in effect, contends that Peters, as president of the bank, was without authority to furnish the information requested by the American Surety Company as to the record and condition of the accounts of Bergman, its cashier, in the existing employment; that the false answers given by Peters were not binding on the bank; and that the surety is not relieved from liability on the bond. Indeed, the contention goes further than this, and necessarily so, in the Wiebe and Peters cases where the employer's statements purport to be given by the bank itself. It is, in effect, urged that the bank could not properly, in view of the statutes, concern itself with the matter of procuring a bond except to the extent of approving the same; that the entire duty to furnish an adequate bond rested upon the officers and employees; and that in undertaking to assist employees or officers in this regard by answering questions as to the conduct, character and accounts of persons already in its employ, the corporation, or any officer thereof, had no power to bind the legal entity by representations or statements. The question of authority to furnish information to the prospective surety must be considered separately from the questions raised by the receiver as to imputed knowledge. That branch of the receiver's contention will be dealt with later, and has an indirect relation only to the ques-

tion of power or authority in the bank or its officers to execute the employer's certificate.

Further elaborating his position, the receiver contends, that the entire board of directors and the whole management of the bank, as well as 80% of its stockholders, were conspirators and engaged in looting the assets of the corporation, and that therefore, the consequences of the false and fraudulent statements, which induced the execution of the surety bonds, may not be visited upon the corporate entity; that this entity is separate and distinct from its stockholders and officers and that the interests of the officers of the bank were adverse to the interests of the corporation, because they were really acting in their own behalf. From these premises, it is said, it follows, whatever knowledge the directors may have had as to the embezzlements of the bank's funds when they fraudulently concealed from and falsely stated material facts to the prospective sureties in order to induce them to assume the risks, cannot be imputed to the corporation, and that, therefore, that legal entity, being distinct from the officers and stockholders was, in law, without knowledge of these material facts and, consequently cannot be charged with concealing or misrepresenting them.

Both defendants offered to return the premiums.

The following questions are, more or less directly, suggested by the record:

1. Was it either unlawful or beyond the power of the bank to concern itself with the procuring of bonds, insuring the integrity of officers and employees, to the extent of making the employer's statements referred to in the record? This question is separate from that of *authority* in the officers to execute such certificates in the name of the bank.

2. Assuming a negative answer to the foregoing, did the officers have authority from the bank to execute the employer's statements so as to bind their principal by material misstatements of facts made therein?

3. May knowledge of the fact that employer's statements were made by the bank, or in its behalf, to the prospective sureties, when the bonds in suit were executed or renewed, be imputed to the corporate entity, in view of the fact that the active officers of the bank, including those who made the certificates, were engaged in embezzlement operations against the principal?

1. Section 5181, Comp. Laws 1913, requires bonds of all employees of Banking Corporations; § 5150, subdivision 5, Comp. Laws 1913, gives the board of directors of banking corporations the power to require bonds of officers and employees. Section 5181, supra, was not a part of the original banking act. Chapter 23, Sess. Laws 1890, but first appears in proto-type in chapter 27, Sess. Laws 1893, as § 31 thereof. Without discussing the history of these provisions further, it is sufficient to say that § 5181 is a specific requirement that a bond must be furnished, adequate in the circumstances, by the bank's officers and employees. The discretion, originally given by § 5150 to the board of directors, as to the amount, and the condition of the bond, has not been expressly restricted. It was plainly the duty of the board of directors of the bank to file with the Banking Department a satisfactory surety bond, insuring their own fidelity as officers and also as employees of the institution. The employer—the corporation—required such a bond from its employees; whether the mandate came from the statute, the by-laws, or a rule of the bank's governing officers, the bond was none the less *required* by the corporation, and, the power or authority of the corporation, its board of directors or its president, to answer inquiries from a prospective surety relating to the existence of prior defalcations by the employee must be tested by reference to the same principles. The rule seems well settled that the corporation, when it requires a bond of an employee, not only has the power to take part in procuring a satisfactory bond to the extent of answering questions as to the employee's record in the existing employment, but that it is its duty to disclose correctly, upon request for such information, any knowledge it may have of past or existing defaults.

"It may be laid down as a general rule, supported by all the authorities, that, where a private employer requires his employee to furnish a fidelity bond, and the former himself takes active steps to secure the same, or the intended sureties make inquiries of him;—it is his duty to disclose to the sureties any prior defalcations of the employee within his knowledge and his concealment thereof under these circumstances will discharge the sureties from all liability upon the bond, if they themselves were ignorant of such defalcations."

The foregoing statement of the law is appended as a part of the learned annotator's note to the case of Hebert v. Lee, 118 Tenn. 133,

121 Am. St. Rep. 989, 101 S. W. 175, 11 Ann. Cas. 1029, as reported in 12 L.R.A.(N.S.) 247. Several authorities are cited and they fully support the text. See also 32 C. J. 62; 21 R. C. L. 989, § 38. The principle stated has been applied in later cases. Phillips v. United States Fidelity & G. Co. 200 App. Div. 208, 193 N. Y. Supp. 482, et seq.; Fidelity & D. Co. v. Duke (C. C. A. 9th) 293 Fed. 661; Cheatham v. Terrell, 198 Ky. 687, 249 S. W. 1018; Park Paving Co. v. Kraft, 262 Pa. 178, 105 Atl. 39.

That a person may not serve a bank or act as an officer without a bond does not warrant the inference that the bank or its managing officers may not properly co-operate in any manner with an officer or employee in procuring a satisfactory bond. The Legislature has deemed it wise, in order to protect the bank from disaster, with possible or probable loss, in the end, to creditors and depositors, to require every officer and employee to furnish a surety bond. as an indispensable condition of the service. Clearly, it would be a perversion of the truth to hold that the bank, or its responsible and active officers do not have such an interest or owe such a duty, with respect to the integrity of officers and employees, or the means requisite to insure the bank and its patrons against loss due to their dishonesty, as to justify the giving of facts or information to the prospective surety pertaining to the manner in which an employee has discharged his duties in an existing employment. Indeed, the facts as to the record of the principals in the bonds in suit, could not be obtained except from the employer. The surety companies had no power to examine the bank's books and records; if the information sought could not be obtained from the bank, or its president and active managing officer, manifestly it could not be properly obtained from any source, and, of course, the bonds would not have been executed. See Willoughby v. Fidelity & D. Co. 16 Okla. 546, 7 L.R.A.(N.S.) 548, 85 Pac. 713, 8 Ann. Cas. 608. In the language of the Supreme Court of the United States in Fidelity & D. Co. v. Courtney, 186 U. S. 342, 349, 46 L. ed. 1193, p. 1197, 22 Sup. Ct. Rep. 836: "It was a reasonable and proper precaution, in anticipation of a desired renewal, to propound the inquiries which were submitted by the surety company. . . . The information solicited was such as was proper to be asked of and communicated by the bank; and, as the renewal was presumably. made upon the faith of the statements

contained in the certificate, the bank ought not to be heard, while seeking to obtain the benefits of the stipulations agreed to be performed by the surety, to deny the authority of its officer to make the representations which induced the surety to again bind itself to be answerable for the faithful performance by McKnight of the duties of his employment."

The undisputed testimony is that employer's statements were mailed to the bank and information supplied by it to the prospective surety, in the Peters case as early as 1914, when the original bond was written. Before any embezzlements by Peters and up to March 19, 1918, five continuation certificates were executed by the Dakota Trust Company in reliance on as many employer's statements purporting to be executed by the bank. The original bond, (Peters was then cashier), covered the period between January 5, and April 23, 1914. The first continuation certificate is dated March 28, 1914, and renews the original bond for one year, from April 23. The embezzlements did not begin until the latter part of 1918, or early in 1919. The employer's statements were uniform and called for the same information from year to year. Such was the practice of the bank. Wholly aside from any question of actual power or authority, as evidenced by a resolution of the board of directors, a by-law of the corporation, or by statute, the testimony shows that it was the established usage of the bank to furnish material information to the prospective surety, and of the surety to rely thereon; and that the facts were always given in the name of the beneficiary itself. Some officer of the bank, ostensibly in the name of the corporation, annually, for five years before the defalcations that ended in its ruin, certified to the Dakota Trust Company material facts, pertaining to the record of Peters in the existing employment, which formed the basis of the obligation to save the bank harmless in the event of larceny or embezzlement by the employee. Up to and including the date of the fifth employer's certificate in 1918, Peters apparently performed his duties faithfully and honestly. When the statements were made, as far as the record shows, no other officer of the corporation was, or had been, guilty of misconduct against it. There is no evidence that would suggest to the liveliest imagination that the officer who executed the employer's certificates during this period did so to serve his own ends, or in furtherance of a design to defraud his principal. The

original bond recites, as has been shown, that the statements are the basis of the bond, and expressly provides that if they be false, there shall be no liability. Under the statutes, § 5181, Comp. Laws 1913, it is required that the bond be approved by the board of directors. We must presume that they did their duty in this regard, at least up to 1918. Of this stipulation the corporation must, therefore, be charged with notice. "If the board examined the bond at all, they are bound to have taken notice of these statements, which is enough to have reasonably put them upon inquiry as to the character of the statements therein referred to. But, whether they actually examined the bonds or not, they must in all fairness and reason be held to have assented to its statements, when appellant elects to claim a recovery upon it." Warren Deposit Bank v. Fidelity & D. Co. 116 Ky. 38, 74 S. W. 1111. That renewals would be made, and new bonds procured, if at all, in reliance on similar statements, made in the name of the bank, or by its responsible officers in its behalf, was known by some of its officers during a period of five years when none of them was a party to a scheme to defraud the corporation. The bank's officers had for years concerned themselves with procuring bonds for officers and employees, and by "usage of this particular bank such function was committed to" them by tacit, if not formal, consent. See American Surety Co. v. Pauly, 170 U. S. 133, 156, 42 L. ed. 977, 986, 18 Sup. Ct. Rep. 552; Fidelity & D. Co. v. Courtney, 186 U. S. 342, 46 L. ed. 1193, 22 Sup. Ct. Rep. 833.

Considerations of prudence and sound policy approve the usage that grew up in the bank to report the true facts as to the prior record of employees, or to agree to notify the surety of acts of dishonesty on the part of a bonded servant immediately upon discovery by the employer. Conduct and stipulation of that kind are in the interest of honesty and good faith in a business deemed to be so intimately connected with the public welfare that the legislature has put it under official surveillance and subjected it to the most rigid public regulation. It serves alike private interest and public morality that the dishonesty of such employees be promptly made known to those who have underwritten their integrity, and as promptly punished by the civil authority. On general principles, unless prohibited by statute, expressly or by necessary implication, it is entirely proper for the employer to adopt all reason-

able means to insure good faith in the transaction of its business by officers and servants. We are entirely satisfied that the giving of the requested information, in the name of the bank, as to the record of the employee in the existing employment, was violative neither of the statutes nor of public policy.

2. Section 6337, Comp. Laws 1913, provides: "Actual authority is such as the principal intentionally confers upon the agent, or intentionally or by want of ordinary care allows the agent to believe himself to possess." See Corey v. Hunter, 10 N. D. 5, 84 N. W. 570. The testimony amply supports the conclusion that the principal—the corporation—"intentionally or by want of ordinary care" allowed its officers to believe that they possessed the authority to execute an employer's statement and furnish information to a prospective surety. All three, Peters, Wiebe and Bergman, were connected with the bank from 1914 until it closed. In 1915 Wiebe became vice-president. The Peters bond was seven times continued; as many employer's statements were made in the name of the bank. This took place before the Peters statement was delivered in the action against the American Surety Company. It would be difficult to imagine a case where an established usage, known to the corporation, more clearly justified a holding that the officers had actual authority, within the statutory definition, to certify information, in its name, to a prospective surety. The officers, in the name of the bank, had given similar information to the Dakota Trust Company for about six years, under circumstances necessarily imputing notice of the practice to the corporation, their principal; it would be a gross perversion of the facts to hold that such officers did not fully and justifiably believe that they possessed the authority to do so. "It is well settled that an authority to act for and bind a corporation may be presumed from acts of recognition in former instances where the power was exercised." Thomp. Corp. 2d ed. § 1704; 7 C. J. 539. See also German American Indemnity Co. v. State Mercantile Bank, 26 Colo. App. 242, 142 Pac. 189. Clearly, as against the Dakota Trust Co., it was too late for the bank to deny the authority of its officers to execute employer's statements in 1920, after having permitted them to do so regularly for six years, each time the Trust Company renewed the original Peters bond.

Our conclusion that the American Surety Company could rely on

the employer's statement does not rest upon the doctrine of estoppel. It is therefore, not essential that it appear from the record that this surety knew the facts and relied thereon when it executed the Bergman bond. The inference of actual authority, from the conduct of the corporation towards its officers and agents, is one of fact; the surety company is entitled to the benefit of this inference notwithstanding it may have been without knowledge of the usage at the time it wrote the bond. In other words the surety could, in order to establish actual authority in the officers to execute the employer's statement, prove that it had been customary for such officers to exercise the identical authority in circumstances warranting the inference that the corporation knowingly acquiesced therein. The conduct of the corporation may thus amount to a practical interpretation of the nature and extent of its agent's authority; Murphy v. W. H. & F. W. Cane, 82 N. J. L. 557, 82 Atl. 854, Ann. Cas. 1913D, 643; Martin v. Webb, 110 U. S. 7, 28 L. ed. 49, 3 Sup. Ct. Rep. 428. That the agents of the corporation, after such authority had been conferred on them, became corrupt, is its misfortune, but not the fault of the surety, or, under the facts, in any manner chargeable to it.

The statements of fact, made by Peters and the bank, as to the record of the employees and their past relations with the bank, whether considered representations or warranties under § 6501, Comp. Laws 1913, referred to by the receiver, bore directly on the risk the sureties were asked to assume; had the real situation been disclosed, and had the sureties been advised of the gross misconduct of Bergman, Wiebe and Peters in the existing employment, including, as it did, actual embezzlement of the bank's assets, it goes without saying that the American Surety Company or the Dakota Trust Company would not have accepted the risks. Indeed, the testimony shows expressly that they would not have done so. The concealments and misrepresentations were directly related to the transaction to which the proposed suretyship would attach; and they affected the liability of the surety in material respects. See Ætna Indemnity Co. v. Schroeder, 12 N. D. 110, 119, 95 N. W. 436; 11 Ann. Cas. 1033, note; and Ann. Cas. 1912D, 1286, note. It follows that the sureties are released from liability under the bonds, unless the fraudulent concealments and actual misstatements of material facts are not binding on or attributable to the

bank, although in one case, made by its president, and as he testifies, in its behalf, and in the other two cases purporting to be made by the corporation itself, because during and after the year 1919, all the officers and directors of the bank were embezzlers and defaulters.

3. This brings us to a consideration of the receiver's contention involving the question of imputed knowledge. Ordinarily the bank is chargeable with the knowledge of its officers. 7 C. J. 530ff; and see Ætna Indemnity Co. v. Schroeder, 12 N. D. 110, 95 N. W. 436. To this general rule there are certain well established qualifications and exceptions. One exception, relied on by the receiver in this case, is stated by the Supreme Court of the United States in American Surety Co. v. Pauly, 170 U. S. 133, 42 L. ed. 977, 18 Sup. Ct. Rep. 552, as follows:

"The presumption that the agent informed his principal of that which his duty and the interests of his principal required him to communicate does not arise where the agent acts or makes declarations not in execution of any duty that he owes to the principal, nor within any authority possessed by him, but to subserve simply his own personal ends or to commit some fraud against the principal. In such cases the principal is not bound by the acts or declarations of the agent, unless it be proved that he had at the time actual notice of them, or, having received notice of them, failed to disavow what was assumed to be said and done in his behalf."

The exception has been recognized in a large number of cases. This court, in Emerado Farmers Elevator Co. v. Farmers Bank, 20 N. D. 270, 29 L.R.A.(N.S.) 567, 127 N. W. 522, refused to apply the exception—the court there admits a qualification of the exception that brings the situation within the general rule—where the officer was the sole representative of the bank in the transaction and fully controlled its action.

The receiver contends that the cases at bar are within the exception, and he relics largely on the case of American Surety Co. v. Pauly, supra. This because the officers and directors were all corrupt, were, as he says, engaged in a conspiracy to defraud the principal, needed the bonds in furtherance of the conspiracy, and, therefore, presumably would not disclose the facts as to the fraud to the corporation.

The fallacies of the receiver's position as to imputed knowledge are

so obvious as almost to elude analysis and concise statement. In the first place, the receiver lays hold on a legal fiction, invented to serve the ends of justice, and seeks to make of it a means for the perpetration of fraud upon persons who have, in good faith, dealt with or who supposed, at least, that they were dealing with, the corporation through the agency of its duly constituted board of directors—in this instance also comprising all the persons in active charge of its business—in relation to a subject matter within the lawful scope of their and its authority. In Moravetz on Private Corporation, vol. 1, § 227, it is said: "The statement that a corporation is an artificial person or entity, apart from its members is merely a description, in figurative language, of a corporation viewed as a collective body. A corporation is really an association of persons, and no judicial dictum or legislative enactment can alter this fact."

In United States v. Milwaukee Refrigerator Transit Co. (C. C.) 142 Fed. 247, it is said: "But when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons."

In First Nat. Bank v. F. C. Trebein Co. 59 Ohio St. 316, 52 N. E. 834, it is said: "The fiction by which an ideal legal entity is attributed to a duly-formed incorporated company, existing separate and apart from the individuals composing it, is of such general utility and application as frequently to induce the belief that it must be universal, and be in all cases adhered to, although the greatest frauds may thereby be perpetrated under the fiction as a shield. But modern cases, sustained by the best text-writers, confine the fiction to the purpose for which it was adopted—convenience in the transaction of business and in suing and being sued in its corporate name, and the continuance of its rights and liabilities, unaffected by changes in its corporate members,—and have repudiated it in all cases where it has been insisted on as a protection to fraud or any other illegal transaction."

In State ex rel. Watson v. Standard Oil Co. 49 Ohio St. 137, 15 L.R.A. 145, 34 Am. St. Rep. 541, 30 N. E. 289, it is said: "On a question of this kind, the fact must constantly be kept in view that the metaphysical entity has no thought or will of its own; that every act ascribed to it emanates from and is the act of the individuals

personated by it; and that it can no more do an act, or refrain from doing it, contrary to the will of these natural persons than a house can be said to act independently of the will of its owner; and, where an act is ascribed to it, it must be understood to be the act of the persons associated as a corporation, and whether done in their capacity as corporators or as individuals must be determined by the nature and tendency of the acts."

Lord Mansfield, in Johnson v. Smith, 2 Burr. 962, 97 Eng. Reprint, 654, said of this fiction: "The court would not endure that a mere form or fiction of law, introduced for the sake of justice, should work a wrong, contrary to the real truth and substance of the thing."

We have already held that the corporate entity must, in law, be charged with having possessed knowledge in 1918, of the usage of the bank, up to that date, to give information, on request, to an intended surety, which had been established for approximately five years before any officer became guilty of bad faith or misconduct towards the corporation. Having known and tacitly sanctioned this usage from 1914 to 1918, and the evidence sufficiently showing actual authority in its officers and agents to give information, the corporation cannot be relieved from the consequences of such knowledge or of such authorization by resort to a legal fiction simply because all its active and managing officers departed from the path of rectitude and became unscrupulous rogues. We concede the soundness of the counter presumption that an agent engaged in defrauding his principal will not give the latter notice of any facts that may expose his own faithlessness. Of the practice of the bank to give employer's statements, of the character of those in the record, to prospective sureties, no notice from the conspirators was necessary in 1919 or in 1920 when the statements were made. The practice—usage—was fully known to and sanctioned by the corporation before its officers embarked upon their enterprise of embezzlement and fraud. It would be a wholly unjustifiable sacrifice of justice under the law to a sympathetic regard for the unfortunate situation of the creditors of the bank, to hold that knowledge of this custom by the corporation, became in some mysterious manner automatically divested when the officers ceased honestly to perform their duties. Such a holding would visit upon innocent parties, the sure-

52 N. D.—49.

ties, the consequences of official misconduct in a manner not warranted by any rule of law of which we have knowledge.

The stockholders selected the directors—entrusted them with the management of, and complete dominion over the corporate business. The surety companies dealt with the duly constituted officers, according to the usage of the bank, and of the suretyship business and in a matter in which they had discretionary power under the statutes. The bonds were executed in reliance on the facts stated by such officers, or by them when purporting to speak for the bank. The sureties had a right to presume that the active officers would act in good faith towards the corporation. Comp. Laws 1913, § 7936, subd. 1. The directors had absolute dominion over it. They were its sole active and managing officers. It was only through them that it could act, speak, see, hear, or know anything. It would not conduce to business stability or enhance confidence in the safety of business dealings with corporations, if the legal fiction of an entity, separate from its officers and stockholders, should, under the facts in the record, be held to save it from responsibility for the fraudulent conduct of its directors, regularly chosen and entrusted with full power to transact its business, in relation to a matter within the scope of their powers, simply because they were, individually or in concert, engaged in a collateral undertaking to defraud their principal. The corporation must be deemed to have had knowledge of the authority actually conferred on its agents and of the usage known to its directors and sole managing officers; in claiming the benefits of the obligations of the bonds it must accept the full consequences of that knowledge. The corporation must be deemed to have had notice that certificates were given by the bank in two cases and by the president, for the bank, in one case, in order to procure bonds for officers and employees of the corporation.

The receiver takes no notice of the rule that the principal is liable for the fraud of his agent "committed as an incident to and during the performance of an act which is within the scope of the agent's authority." Mechem, Agency, 2d ed. § 1984. Applied to the facts, this principle excludes the exception to the rule of imputed knowledge. Says the same author, § 1990: "The American cases have generally held the principal liable to innocent third persons where the representation was made in the course of the principal's business and appar-

ently for his account and while the agent was acting within the general scope of his authority, even though in the particular case he was secretly abusing his authority and attempting to perpetrate a fraud upon his principal or some other person for his own ultimate benefit," citing Phillips v. Mercantile Nat. Bank, 140 N. Y. 556, 23 L.R.A. 584, 37 Am. St. Rep. 596, 35 N. E. 982. See also McCord v. Western U. Teleg. Co. 39 Minn. 181, 1 L.R.A. 143, 12 Am. St. Rep. 636, 39 N. W. 315. The stockholders elected the directors and the bank engaged its servants; these were authorized by the bank to give certain information to prospective sureties. The officers and agents of the corporation had answered similar questions for approximately five years before the defalcations commenced; they answered the same questions in two cases and similar questions in one case, but in each instance the answers were grossly false and wholly misleading. Sureties, who dealt with these agents, in the usual course of business and in the ordinary manner, with nothing known, or that in law should have been known, to excite suspicion could rely on the presumption that such agents honestly discharged the duty of good faith which the principal owed the members of the public who transacted business with it.

It is strongly argued by the receiver that the employer's certificates and the procuring of bonds was a necessary part of the scheme of the directors to embezzle the assets of the bank, that they were acting for themselves and that, therefore, their conduct and statements cannot be charged to the corporation. This contention has already been answered by what we have said on the subject of authority and imputed knowledge. There is another answer to the receiver's position on this point, that is not without substantial force.

It is doubtful if it can be correctly said that the directors of the bank, in furnishing the information to the prospective sureties, were acting for themselves individually, within the rule that "if in the course of the same transaction in which he is employed, the agent commits an independent fraud for his own benefit, and designedly against the principal, and it is essential to the very existence or possibility of such a fraud that he should conceal the real facts from his principal, the ordinary presumption of a communication from the agent to his principal fails; on the contrary, a presumption arises that no communication was made, and consequently the principal is not affected with

constructive notice." 2 Pom. Eq. Jur. 4th ed. § 675. It must be borne in mind that the question is whether the corporate entity may be charged with notice, and with all the consequences thereof, that an employer's statement was made to the sureties as a basis of the bonds in suit. In what manner, if any, it may be asked, did the making of the employer's statement aid the officers of the bank in the execution of existing or anticipated embezzlement operations? Can it be fairly said that concealment by the officer of the fact that he furnished employer's certificates to a prospective surety in 1920, in accordance with a usage of six years, was "essential to the existence or possibility of such a fraud," as the bank officers were then practicing against the corporation? It is submitted that the answers to these queries furnish a persuasive test by which to determine whether the general rule of imputed knowledge should be applied. Assume that president Peters had, at a meeting duly called and attended by all the stockholders, notified them, that he, as president, or some other officer, as the circumstances required, always executed employer's certificates, at the request of prospective sureties, as had been customary for six years, containing a statement of facts as to the record and accounts in the existing service of the persons to be bonded. Would such information, actually given the corporation, have had the slightest logical tendency to expose the current dishonesty of the servants of the bank? It would seem not. The concealment of this practice of the bank's officers was not directly essential to the successful and continued prosecution of existing schemes of embezzlement or misappropriation of corporate assets. It is true that bonds could not have been procured from the defendants but on the strength of employer's certificates that disclosed no facts casting doubts upon the risks. Procuring an adequate surety bond, however, was not contrary to, but for, the bank's interest. In one sense only was the procuring of a bond necessary to the success of their fraudulent scheme, namely, because failure or refusal on the part of the bank to comply with the lawful orders of the State Banking Board in this, as in any other matter, would authorize insolvency proceedings against it. Comp. Laws 1913, §§ 5183 and 5189; Sess. Laws 1915, chap. 53. The furnishing of the employer's statement had no real or primary connection with the corrupt enterprise in which the directors were engaged. A bond was required, and must be obtained in all cir-

cumstances, whether the bank management was honest or dishonest, faithful or unfaithful to its trust; it did not aid the dishonest purposes of the directors and managing officers except indirectly and incidentally in so far as embarrassing proceedings by the State for failure to comply with the statutes would be avoided. The bank authorized its agents and officers to give information to a prospective surety, and i bound by the false statements of material facts made by its officers. It acquiesced at all times without protest in this business custom of its own agents. In view of the usage of the bank, from 1914 to 1918, it is doubtful if answering the questions propounded by the prospective surety in 1920, can be fairly said to bear a necessary relation to or be a necessary part of embezzlement operations in which the officers may have been engaged against the interest of the bank at, or prior to, the time such bonds were procured. It would seem extremely doubtful, in the circumstances, whether the exception to the rule of imputed knowledge can be invoked. We find it unnecessary to decide this point. It is sufficient that the corporation, by giving authority to its officers, put it in their power to suppress or misstate material facts to the prospective surety. The effect of this principle cannot be avoided by showing collateral frauds against the principal by the agent.

It is said that it does not appear that the board of directors approved the bonds. The bonds, with the conditions stated, must be regarded as having been approved by the beneficiary. They were retained by the bank and the bonded persons were employed and retained in office. 7 C. J. 524. By bringing suits thereon, the receiver, by necessary implication, treats them as having been acceptable to the bank, and as binding on the surety. 9 C. J. 19. In Warren Deposit Bank v. Fidelity & D. Co. 116 Ky. 49, 74 S. W. at p. 1113, is said:

"Appellant asserts, by seeking to recover upon the bond, that the contract was made on its behalf, and that it was authorized. It is not claimed, nor is it attempted to be shown, that the board of directors acted at all in that matter, so far as any proceeding by their body is concerned. The action of Smallhouse, then, was that which represented the bank, in that transaction. If the bank would avail itself of the benefit of his actions, it must take them subject to his representations and statements that induced the execution of the contract by the surety." See 7 L.R.A.(N. S.) 550 and note.

It must not be forgotten that paragraph six of the bonds executed by the Dakota Trust Company expressly provides that if, after the bond is written, the employer, *"or any officer of the employer,"* acquires notice of facts indicating dishonesty, notice must at once be given the surety, and there shall be no liability for acts thereafter committed. It is said that the corporation cannot be charged with notice of the acts of dishonesty; but the contract is, that if any *officer* knows of such act, the *employer* must give notice thereof forthwith. Does this condition of the undertaking become inoperative and is the employer released from the obligation to notify the surety of the acts of dishonesty of a bonded *officer or employee,* simply because another officer or employee, who knows of such acts of dishonesty, either independently or in concert with the former, is guilty of a criminal breach of trust towards his principal, the corporation? Wiebe as vice-president knew of Peter's acts of dishonesty. Was the bank released from this condition in the bond because Wiebe, singly, or as a member of a conspiracy, was systematically embezzling the bank's property? To ask the question is to answer it, and yet it seems that the receiver would release the bank from this clause in the bonds because *all* the directors and active managing officers were rogues. There is no stipulation in the bond that the employer shall be relieved from this duty if officers or employees, other than the one bonded, should turn out to be knaves. In the circumstances, the consequences of official rascality, permeating the entire active management of the corporation, cannot be extended so as to deprive parties, who have acted in complete good faith and dealt with corporate officers in accordance with customary business usages, of the benefits of a valid contract. The employer, by suing on the bond, is bound by this condition of liability. The corporation, in effect, agrees unconditionally to accept full responsibility for and all the consequences of knowledge of acts of dishonesty received by any officer, other than the one bonded; that is, the bank unqualifiedly agrees that the knowledge of an officer, in this respect, should be imputed to it. *All the officers* of the bank knew of the acts of dishonesty of the bonded employees, not only before the bonds were executed, but at the moment of and immediately subsequent to their execution. No notice was ever given the surety. Such a stipulation is not onerous, or in any manner contrary to public policy; it was made a condition of liability, and

we have no right to strike it from the contract. W-- are asked to enforce the bond; we must take it as we find it, and give proper effect to all its provisions.

The receiver relies mainly on American Surety Co. v. Pauly, supra. That case is clearly not controlling an any issue necessarily involved in the consolidated actions. The statement, there relied on by the surety, did not purport to come from the bank; there was no custom, practice or usage in the bank to furnish information to prospective sureties. The absence of such usage is stressed in the opinion (170 U. S. 153, 156, 42 L. ed. pp. 985, 986, 18 Sup. Ct. Rep. 552). There was, in short, not the slightest evidence of authority, actual or ostensible, in Collins to certify as he did with reference to O'Brien's character or record, and the court held that he did so in aid of his own fraudulent schemes against the interests of the bank.

It has not been easy to find precedents helpful in the solution of the questions raised under facts substantially identical to those in the instant cases. Fortunately, it is rare, it seems, to find a genius for organization so completely unhampered by the simplest scruples of honesty that 80% of the stockholders, all the managing officers, and the entire board of directors of a bank, can be co-ordinated by him into a thoroughly harmonious and smoothly operating system of rascality. It was seemingly the misfortune of the Mohall State Bank to come under the baleful influence of such a person. The results of knavery are usually far reaching and always deplorable; they are both in this instance. The losses occasioned by the faithlessness of the bank's officers must fall on many persons who can ill afford to bear them. The heavy burden in this case will probably be borne by the creditors, among whom are, doubtless, many depositors. It is not in our power to lessen this burden. We have decided these cases on principles, the soundness of which cannot be questioned; we believe the facts not only justify but require that they be applied and regarded as controlling. The judgment of the trial court, must accordingly, be reversed. It is so ordered.

CHRISTIANSON, Ch. J., and BIRDZELL, NUESSLE, and BURKE, JJ., concur.