## UNITED STATES FIDELITY & GUARANTY CO. v. MUIR.

(Circuit Court of Appeals, Second Circuit. April 8, 1902.)

No. 112.

BANKS—PRESIDENT—POWERS — STATEMENT TO SURETY COMPANY — CASHIER'S BOND.

A bank cashier applying to a surety company for a bond accompanied the application with a statement as to his past conduct and the condition of his account, signed by the president of the bank, which was incorrect, though made in good faith. Such statement was not referred to in the bond issued. The president had no special authority to make it, and none of the directors knew of it until interposed as a defense in a suit on the bond; defendant claiming that the statement was either a false warranty by the bank, or a misrepresentation by it of material facts, which induced defendant to execute the bond. *Held,* that making the statement was no part of the duties of the office of president, and not within his implied powers or ordinary duties, but was his individual act, by which the bank was not bound.

In Error to the Circuit Court of the United States for the District of Vermont.

This cause comes here upon writ of error by the defendant from a judgment of the circuit court, district of Vermont, entered upon the verdict of a jury, under instructions of the court, in favor of defendant in error, who was plaintiff below. The action was for debt, to recover the penalty of a bond executed by the defendant, guarantying the faithful performance by Chas. W. Mussey of his official duties as cashier of the plaintiff bank. The breach of the bond consisted in the unlawful and fraudulent misappropriation of the funds of the bank by the cashier to an amount largely in excess of the penalty of the bond.

W. B. C. Stickney, for plaintiff in error.

Joel C. Baker and F. F. Oldham, for defendant in error.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. The bond is dated December 27, 1898. Prior thereto the American Surety Company had been the surety for the cashier. He applied to the board of directors to be allowed to substitute the defendant company, for the reason that it would cost him less. Consent was given by the board to his doing so if he could obtain a bond from the new company. No other action was taken by the board, Mussey being left to take whatever steps were necessary to procure it. There is no dispute that there were defalcations by the cashier, subsequent to the execution of the bond, in excess of its penalty; nor is there any dispute that, for a considerable period of time before the bond was applied for, the cashier was a defaulter in a very large sum,—certainly in excess of $20,000. The principal defalcation consisted in having loaned to Marvin A. McClure funds of the bank, for which he took said McClure's notes, without authority and against the will of the bank, and under circumstances which amounted to embezzlement of the funds of the bank. An examination and comparison of the notes in the bank with the discount register and general balance would at any time have immediately detected

the defalcation. A committee of the board of directors made period-ical examinations, but failed to discover anything wrong, because, even in the examination of his accounts, they placed entire confidence in the cashier. The way in which he deceived them was this: He brought before them all the notes, except the notes of McClure, and with them several loose sheets of paper, on which the amounts of the notes were entered; these sheets being in his own handwriting. These sheets were handed to the committee. One of them would read the maker and amount of a note, and the other would check the amount off which agreed with it. After that the first sheet was· handed to the cashier, who, while the committee were busy with sheet No. 2, would add to sheet No. 1 whatever figures were neces-sary to make a prearranged amount. So when the committee came to add that sheet of paper the additions would be correct, and the total additions of all the sheets would agree with the total amount of bills receivable, as shown by the general ledger. The examinations, therefore, failed to reveal the cashier's defalcations, because the com-mittee of the board of directors in effect made the defaulter himself one of the examiners.

When he applied for the bond, Mussey, the cashier, presented a written application, in which he made certain representations and an-swered certain questions. He also presented a paper called "Em-ployer's Statement," which is given below. The bond is not printed in the record, but from the pleadings it must be assumed that it con-tained no reference whatever to the written application or to the em-ployer's statement. The last-named document reads as follows:

"Employer's Statement.

"(For Completion by Proper Officers on Behalf of the Employer.)

"The replies of the applicant herein are, to the best of my knowledge and belief, correct. He has been in the service of the undersigned employer since March 1, 1885, filling position of cashier, and has continuously filled the po-sition for which this bond is required since March 1, 1885. He has always, to the best of my knowledge and belief, given satisfaction in his personal conduct and performance of duties, and kept his accounts faithfully and without default. When last examined or audited by board of directors, on the twelfth day of December, 1898, all the accounts of his office were found in every respect correct up to December 12, 1898.

"He has not been, nor is he at present, so far as I know or believe, in ar-rears, default, or with unsettled balance, in this or any previous service. I know of nothing concerning his habits or antecedents affecting his title to confidence, and I know of no reason why the guaranty hereby applied for should not be granted.

"(If there are any exceptions to the statements made in the above cer-tificate, please give particulars hereunder.)  *  *  *

"The maximum amount of employer's money he will probably have in hand at one time is $———. Bond is required to be in force from Dec. 1, 1898, up to Dec. 1, 1899, to cover applicant as cashier at Merchants' Nat. Bank. Amount required, $20,000.

"Premiums to be paid by said Mussey.

"Dated at Rutland, Vt., this 15th day of December, 1898.

"[Signature]                                    John A. Mead,
                                   "(Official Title) President

"On behalf of
"The Merchants' Nat. Bank,
"The Employer."

This statement was signed by Mead, the president of the bank, at the request of Mussey, who brought it to him filled out as it now appears. He signed it entirely of his own motion; neither the board of directors, nor any of the directors individually, having ever directed or authorized him to sign such statement, or having even heard of its existence.

The contention of the defendant's counsel is thus set forth in the brief:

"So far as said statement purports to represent what the said bank had done and ascertained about the subject-matter concerning which inquiry was made of it, to wit, 'when last examined or audited by board of directors, on the twelfth day of December, 1898, all the accounts of his [said Mussey's] office were found in every respect correct up to December 12, 1898,' the plaintiff in error claimed that the same was a false statement by the bank, and that it was either a false warranty or a misrepresentation of a material fact by the other contracting party to the bond in suit; it being an unqualified statement of the matters alleged as true, when said party did not know them to be true, and when in fact they were false; said statements having been made with a view to induce the plaintiff in error to believe them and to execute the bond in suit; said plaintiff having no other knowledge about them. That said plaintiff in error, by reason thereof, relying upon the truth of said representations, executed and delivered said bond, which it would not have done except for such belief and reliance."

In the first place, it may be noted that there is no suggestion of any fraud in the case, except on the part of Mussey. The president and the directors all acted with entire good faith. Each and all of them honestly believed that the cashier was faithful, and his accounts correct. In the second place, there is no question here of any warranty. It was entirely within the power of the surety company to have made some statement as to the cashier's past faithfulness a part of the policy, or even to refer in the policy to the application and employer's statement, making them a part of the contract; but, for some sufficient reason, it chose not to do so. In the third place, although the directors may have been grossly negligent in their examination of the cashier's accounts, a stranger cannot make of that negligence, alone, a cause of action or a ground of defense. Apparently the defendant concedes this, because the argument for reversal is based upon the propositions that the surety company had no knowledge or information as to the cashier's accounts, except this employer's statement; that it believed the same; that it issued the bond in reliance upon the truth of said statement; and that, but for such belief and reliance, it would not have issued said bond. The only question in the case, then, is, did the bank, the obligee under this contract, make this statement or representation as to the examination of the cashier's accounts, and the result of such examination? Upon the facts in proof here, this is no longer an open question in the federal courts. The decision of the United States supreme court in Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977, is controlling. In that cause a surety company had given a bond for the faithful performance of his duties by a cashier. Prior to execution of the bond the cashier had made a written application containing answers to certain questions as to age, history, habits, etc., and had presented a certificate signed by the president of the bank, neither of which documents were referred to in the

policy, or made by reference a part of the contract. The certificate is substantially the same as the statement now before us. It reads:

"I have read the foregoing declarations and answers made by George N. O'Brien, and believe them to be true. He has been in the employ of this bank during three years, and, to the best of my knowledge, has always performed his duties in a faithful and satisfactory manner. His accounts were last examined on the 28th of March, 1891, and found correct in every respect. He is not, to my knowledge, at present, in arrears or default. I know nothing of his habits or antecedents affecting his title to general confidence, or why the bond he applies for should not be granted to him."

The certificate in the Pauly Case, as the statement in this case, was signed by the president of the bank of his own motion. Referring to many authorities cited in argument, the supreme court calls attention to the circumstance that many of them arose directly between the sureties and corporations represented by their boards of directors, or by some of their officers, acting within the authority conferred upon them; and the others arose out of the agent's acts or declarations in the course of the business intrusted to him. The court then proceeds:

"None of the cases cited embrace the present one. In the first place, the procuring of a bond for O'Brien, in order that he might become qualified to act as cashier, was no part of the business of the bank, nor within the scope of any duty imposed upon Collins as president of the bank. It was the business of O'Brien to obtain and present an acceptable bond. And it was for the bank, by its constituted authorities, to accept or reject the bond so presented. The bank did not authorize Collins to give, nor was it aware that he gave, nor was he entitled by virtue of his office as president to sign, any certificate as to the efficiency, fidelity, or integrity of O'Brien. No relations existed between the bank and the surety company until O'Brien presented to the former the bond in suit. What, therefore, Collins assumed, in his capacity as president, to certify as to O'Brien's fidelity or integrity, was not in the course of the business of the bank, nor within any authority he possessed. He could not create such authority by simply assuming to have it. The circuit court of appeals well said that there were many acts which the president of a bank may do without express authority of the board of directors, in some cases because the usage of the particular bank impliedly authorized them, in other cases because such acts were fairly within the ordinary routine of his business as president, but that the making of a statement as to the honesty and fidelity of an employé, for the benefit of the employé, and to enable the latter to obtain a bond insuring his fidelity, was no part of the ordinary routine business of a bank president; and there was nothing to show that, by any usage of this particular bank, such function was committed to its president. It must therefore be taken, as between the bank and the company, that the former cannot be deemed, merely by reason of Collins' relation to it, to have had constructive notice that he, as president, gave the certificate in question."

It is true that in the Pauly Case the president and cashier were in collusion; but the above excerpt places the decision on the broader ground, and that decision is in no way qualified by Guarantee Co. of North America v. Mechanics' Sav. Bank, 22 Sup. Ct. 124, 46 L. Ed. ——. In the case last cited, before the cashier's bond was issued the company "submitted for reply on behalf of the bank" certain questions, addressed to the president, which, and the answers thereto by the president as such, are referred to in the bond as "Employer's Guaranty, No. 154,806." The bond further contained this clause:

"That any written answers or statements made by or on behalf of said employer in regard to or in connection with the conduct, duties, accounts,

or methods of supervision of the said employé, delivered to the company, either prior to the issue of this bond or to any renewal thereof, or at any time during its currency, shall be held to be a warranty thereof, and form a basis of this guaranty, or of its continuance."

In differentiating this Case of the Mechanics' Savings Bank from the Pauly Case, the supreme court says:

"The statements were made, and were required to be made, on behalf of the bank, and the president acted for the bank in so doing; and the bonds were procured by the bank, and the bank paid the premiums."

The fundamental principle laid down in the Pauly Case is unqualified by the later decision, and is controlling of this case.

The judgment is affirmed.