[No. 24459. *En Banc.* November 29, 1933.]

WILLAPA PULP & PAPER MILLS, *Appellant,* v. AMERICAN EMPLOYERS' INSURANCE COMPANY, *Respondent.*[1]

*Guy E. Kelly,* for appellant.

*Palmer, Askren & Brethorst (B. E. Lutterman,* of counsel), for respondent.

BLAKE, J.—Plaintiff brought this action to recover the principal sum (twenty-five thousand dollars each) of two fidelity bonds, written by defendant, guaranteeing plaintiff against loss through the chicanery and thievery of its president and secretary. From a judgment dismissing the action, plaintiff appeals.

This is a somewhat involved, but very interesting, story of the looting of a perfectly solvent corporation by the holding company-interlocking directorate method.

Appellant is an Oregon corporation, organized in 1927 for the purpose of building and operating a wood pulp plant at South Bend, Washington. On February 26, 1930, it was free from debt and possessed of the following assets: 2,600 acres of timber land (including 350 acres of lime deposit) ; 65 acres at South Bend, upon which was situated a fully equipped saw mill; and approximately one hundred thousand dollars in cash on deposit in banks at Portland, Oregon. On and prior to that date, the destinies of appellant were under the control of R. A. Swain, A. E. Barry and C. L. Burton, who owned or controlled 31,500 shares of the common stock. Swain and Barry were on the board of directors—the former being the president and the latter secretary of the corporation.

It had been the hope and policy of the board of directors to float a bond issue to build the pulp plant, and hold all its cash in reserve for operating purposes. On the date mentioned, a directors' meeting of the appellant company was held at Portland. There Swain

introduced one G. A. Moulton, as a financial agent of large resources. Moulton was running a string of corporations euphoniously called the "British-American Group." The name of his holding company was "British-American Consolidated Properties, Ltd.," which will hereafter be referred to as the "Consolidated." One of its wholly owned subsidiaries was named "British-American Mines & Smelters Corporation, Ltd.," which will hereafter be referred to as "Smelters."

Moulton proposed to finance the building of the pulp plant, agreeing to furnish at least fifty thousand dollars a month. Upon completion of the plant, appellant was to issue and deliver to him six per cent bonds in the total amount so advanced. As conditions to this proposition, however, Moulton required that he be given the right to purchase the control of the common stock of appellant, and that the directors (with the exception of two) all resign and certain persons, to be named by him, should be elected to the board.

A contract between appellant and "Consolidated" was drawn and executed, substantially embodying these terms. The old directors thereupon resigned, and Moulton's minions were elected in their stead. Among them were John F. Telander, H. G. Beckwith and William Henderson. Telander was immediately elected president of appellant, and Newton C. Weaver secretary. Telander was a director and secretary of "Smelters." Later on, and during the looting process, Weaver became a director and secretary of "Smelters."

Before the old board resigned, it adopted a resolution declaring that none of the money on deposit should be loaned or used in the construction of the

pulp mill. The old board also adopted a resolution requiring the officers to furnish fidelity bonds.

The new board immediately took over the meeting, with Telander presiding as president, and Weaver acting as secretary. By resolution, an executive committee, consisting of Telander, Beckwith and Henderson, was elected. This was done pursuant to the provisions of appellant's by-laws. The board of directors undertook to delegate all of its own powers to this executive committee. It will be borne in mind that all of the events above narrated took place in Portland on February 26, 1930.

On February 28th, a quorum of the newly formed executive committee, consisting of Telander and Henderson, met in Seattle and adopted a resolution reciting that the cash on hand should not be allowed to lie idle; that it should be invested in or loaned on interest-bearing securities. Moulton was also present, directing the committee's action. It was then understood that the "loans" of appellant's funds were to be made to "Smelters."

On March 3rd, Telander and Weaver applied to respondent for fidelity bonds in favor of appellant, in the sum of twenty-five thousand dollars each. Accompanying these applications were what are designated: "Employer's Statement for Fidelity Bond." These were executed by "Willapa Pulp and Paper Mills, by J. F. Telander, President." These statements, among others, contained the following questions: "Is the applicant at present in your employment? Have his duties while in your service been performed in a faithful and satisfactory manner? Has any person holding the same or a similar situation as that to be held by applicant been detected in any defalcations?" The first and second questions were an-

swered "Yes"; the third "No". The bonds were issued, effective March 3rd, at noon.

Respondent interposed an affirmative defense, alleging that these answers constituted false and fraudulent representations, rendering the bonds void. In our view, the decision of the case must turn upon the issue thus raised. To solve the problem, further facts must be set out.

Be it remembered that, as part of the deal whereby Moulton agreed to finance the construction of the pulp plant, he was to acquire control of the common stock. To this end, Swain, Barry and Burton had agreed to sell him their stock. Under date of March 1st, Moulton, in part payment of the purchase price of such stock, caused the following checks, signed by "Smelters," to be issued on American Exchange Bank of Seattle: $10,000 in favor of Swain; $10,000 in favor of Barry; $14,510 in favor of Burton; and $2,000 in favor of one Rice. These checks were all countersigned by Telander. At the time these checks were drawn, "Smelters" had to its credit in the bank the sum of $489.60. We feel justified in adding that this amount was then its principal asset—at any rate, the deposit constituted its only liquid asset.

On March 3rd, Telander and Weaver, as president and secretary of appellant, withdrew $85,968.70 from the Portland banks, and deposited it to the credit of appellant in the American Exchange Bank of Seattle. There seems to be some controversy as to whether this account became available to appellant in the latter bank before March 4th. We are satisfied, however, that the withdrawal of the funds from the Portland banks was in progress on March 3rd, at the time the applications for the fidelity bonds were presented to respondent.

On March 4th, Telander and Weaver drew appel-

lant's check on American Exchange Bank (and in favor of that bank) for $40,000. This was credited to the account of "Smelters." On the same date, the checks to Swain, Barry, Burton and Rice, above referred to, were certified. (It should be said, in justice to these gentlemen, that they did not know until some months later that their checks were in reality drawn on funds belonging to appellant.)

From that time on, the inroads of "Consolidated" and "Smelters" on the funds and liquid assets of appellant were swift and sure. By processes of "kiting," "exchanges" and the issuance of "Smelters" notes, to keep the books of the two companies in apparent balance, appellant, by June of 1930, was stripped of everything but its land, sawmill and some $15,000 on deposit in United States National Bank of Portland, being held in trust by the corporation commissioner of Oregon.

The story ends with the receivership of the "British-American Group" (including appellant) in February, 1931. At that time, appellant's liabilities amounted to about $9,000, consisting of taxes, insurance and salaries of watchmen at the sawmill, all of which the Moulton directors had allowed to go unpaid. The old directors then stepped in. Moulton's directors resigned, and the appellant company went back under its old management, which paid its debts and the expenses of the receivership, and brought this action.

We feel little need be said in support of the judgment of the trial court. It is a rule, generally recognized by the courts, that a misrepresentation of a material fact, made by the obligee in support of an application for a fidelity bond, avoids the obligation on the bond. *Herbert v. Lee,* 118 Tenn. 133, 101 S. W. 175, 12 L. R. A. (N. S.) 247 (case and note), 121 Am. St. 989; *Willoughby v. Fidelity & Deposit Co.,* 16

Okla. 546, 85 Pac. 713, 7 L. R. A. (N. S.) 548; *McIntosh v. Dakota Trust Co.,* 52 N. D. 752, 760, 204 N. W. 818, 40 A. L. R. 1021; *Guarantee Co. v. Mechanics' Savings Bank & Trust Co.,* 183 U. S. 402; *Duke v. Fidelity & Deposit Co.,* 5 Fed. (2d) 305; *Issaquah Coal Co. v. U. S. Fidelity & Guaranty Co.,* 126 Fed. 89. Nor does the fact that the officer making the misrepresentation is himself a participant in the fraud perpetrated in his own company make the misrepresentation any the less the act of the corporation. Of a similar situation, the supreme court of North Dakota, in *McIntosh v. Dakota Trust Co., supra,* said:

"The receiver contends, that the entire board of directors and the whole management of the bank . . . were conspirators and engaged in looting the assets of the corporation, and that therefore, the consequences of the false and fraudulent statements, which induced the execution of the surety bonds, may not be visited upon the corporate entity . . . The sureties had a right to presume that the active officers would act in good faith towards the corporation. . . . The directors had absolute dominion over it. They were its sole active and managing officers. It was only through them that it could act, speak, see, hear, or know anything. It would not conduce to business stability or enhance confidence in the safety of business dealings with corporations, if the legal fiction of an entity, separate from its officers and stockholders, should, under the facts in the record, be held to save it from responsibility for the fraudulent conduct of its directors, regularly chosen and entrusted with full power to transact its business, in relation to a matter within the scope of their powers, simply because they were, individually or in concert, engaged in a collateral undertaking to defraud their principal."

Since the wrongful diversion of appellant's funds had been initiated and was, in fact, in progress at the time the bonds were applied for, the answers to the questions, hereinbefore set out, constituted fraudulent

representations. Being such, they avoided the respondent's obligations under the bonds at their inception.

Appellant's losses are regrettable. They are due, however, to the fact that its stockholders voluntarily placed its affairs in unworthy hands. It is apparent that the transaction was conceived with fraudulent intent, at its very inception, by Moulton and his associates. But this is no reason for permitting appellant to recoup its losses from respondent, upon which the swindlers also attempted to perpetrate a fraud at the same time. To allow appellant to recover would be to set up two wrongs, where but one existed before.

The judgment is affirmed.

MILLARD, MAIN, MITCHELL, STEINERT, and GERAGHTY, JJ., concur.

TOLMAN, J. (dissenting)—The transfer of appellant's deposit from the Portland bank to the Seattle bank was not forbidden, and did not, of itself, deprive the appellant of the money. The first breach of duty on the part of the insured officers was in wrongfully disbursing that money from the Seattle bank on March 4th. Therefore, they had committed no defalcation on March 3rd, and the answers given to the bonding company on behalf of the employer were true when made.

I therefore dissent.

BEALS, C. J., and HOLCOMB, J., concur with TOLMAN, J.