[No. 27370. *En Banc.* December 19, 1939.]

HERBERT E. POST, *as Receiver, Respondent,* v. MARYLAND CASUALTY COMPANY, *Appellant.*[1]

[1]Reported in 97 P. (2d) 173.

*Charles T. Peterson,* for appellant.

*Reuben E. Carlson* and *Hayden, Metzger & Blair,* for respondent.

BLAKE, C. J.—These are two actions on a fidelity bond brought by the receiver of Morrison & Company and Morrison Investment Company, two corporations owned, managed, and manipulated by Stanley G. Morrison to swindle friends, acquaintances, and strangers.

The bond, executed February 21, 1933, at the instance of Morrison, ran to "Morrison Investment Company and/or Morrison & Company, Inc.," called "the Employer." By its terms, the surety agreed to

" . . . reimburse the Employer for any and all loss of money, securities or other personal property (including that for which the Employer may be responsible to others), which the Employer shall have sustained by reason of any act or acts of *Fraud, Dishonesty, Forgery, Embezzlement, Wrongful Abstraction* or *Wilful Misapplication* on the part of any Employee named in the schedule hereto attached, . . ."

Under the schedule, Morrison's fidelity to his employer was guaranteed in the amount of twenty-five thousand dollars. The bond was continued in force by the payment of annual premiums until February, 1936. By that time, Morrison had appropriated to his

own use assets of each corporation in excess of twenty-five thousand dollars.

Herbert E. Post was appointed receiver of both corporations and, as such, brought actions in behalf of each for the full amount of the guarantee. The cases were consolidated and tried before a jury, which returned a verdict for twenty-five thousand dollars in each case. From judgments entered upon the verdicts, defendant appeals.

The bond contained the following stipulation:

"THIS BOND is executed upon the following express conditions, which are conditions precedent to the right of the Employer to recover hereunder:

". . . *that the Employer shall not have had at the date hereof, . . . any knowledge of any act of fraud or dishonesty committed by any of said Employees while in the service of the Employer or elsewhere; . . .* " (Italics ours.)

That Morrison, prior to the time the bond was executed, February 21, 1933, had been guilty of fraud and dishonesty in the management of Morrison & Company, there can be no dispute. We do not understand the respondent to contend otherwise. Indeed, he is in no position to dispute it, for claims upon which he bases his right to recover extend to defalcations of Morrison prior to that date.

Morrison & Company was organized in 1928, but did not commence operations until June, 1932. Morrison owned all the stock except that held by directors as qualifying shares. Morrison Investment Company was organized February 16, 1933. All stock in that company, except qualifying shares held by directors, stood in the name of Morrison & Company, Inc. Although Morrison & Company was engaged in other insurance and real estate business, the principal use Morrison made of both corporations was to obtain money from the investing public for his own ends.

Morrison's method was to obtain money from investors upon the representation that the former company would purchase Home Owners Loan Corporation bonds, which would be pooled with bonds purchased with the money of other investors. When the bonds so pooled were sold, the profits were to go one-half to Morrison & Company and one-half to the investors in ratio to the amount of their investment. Receipts were delivered to investors embodying the terms upon which their money was to be used and under which profits were to be distributed, as above outlined. So far as the record shows, none of the money so obtained was invested in H. O. L. C. bonds.

Morrison Investment Company was manipulated in much the same manner. Its ostensible objective was to buy and sell shares in savings and loan associations. That Morrison did an extensive business of acquiring and selling shares in savings and loan associations, there can be no doubt; but, when the debacle came in 1936, the amount of such in the portfolios of the corporations was negligible. In his operations in shares of savings and loan associations, Morrison sometimes used one or the other of the corporations as a conduit to sluice the savings of the investors into his own pocket. But on some occasions his operation on the investor was more brazenly direct. A typical instance: On February 20, 1933, David Fleetwood executed and delivered to Morrison the following assignment of his savings account in the Capital Savings and Loan Association:

"You are hereby authorized to transfer $10,000.00 from my Savings account No. 5253 to Savings Account No. 16070 in the name of Stanley G. Morrison."

Upon the same day, ten thousand dollars was transferred from Fleetwood's account to Morrison's account No. 16070, which, likewise on the same day, was as-

signed to a purchaser, who paid Morrison in the neighborhood of five thousand dollars in cash for Fleetwood's shares. This was one of the items upon which the receiver based his claim against the bond. An investor, who was also vice-president of Morrison & Company, testified that he knew, as early as January, 1933, that Morrison was using corporation funds "in his private deals."

So it is clear that, prior to the inception of the obligation on the bond, Morrison had been guilty of acts "of fraud and dishonesty." It was at his instance, as president of both corporations, that the bond was procured. His concealment of his own acts of fraud and dishonesty constituted a fraud upon the surety and a breach of the above quoted stipulation in the bond. *Guarantee Co. of North America v. Mechanics' Sav. Bank & Trust Co.,* 183 U. S. 402, 46 L. Ed. 253, 22 S. Ct. 124.

It is held generally that concealment by an employer obligee of previous defalcations of the employee whose fidelity is guaranteed, releases the surety of its obligation when the bond contains a stipulation such as that above quoted, or when previous defalcations are not disclosed in the employee's statement in support of the application for the bond. *Guarantee Co. of North America v. Mechanics' Sav. Bank & Trust Co., supra; Franklin Bank v. Cooper,* 36 Me. 179; *Glidden v. United States Fidelity & Guaranty Co.,* 198 Mass. 109, 84 N. E. 143; *W. A. Thomas Co. v. National Surety Co.,* 142 Minn. 460, 172 N. W. 697; *Sunderland Roofing & Supply Co. v. United States Fidelity & Guaranty Co.,* 84 Neb. 791, 122 N. W. 25; *United States Life Ins. Co. v. Salmon,* 91 Hun 535, 36 N. Y. Supp. 830 (affirmed 157 N. Y. 682, 51 N. E. 1094); *McIntosh v. Dakota Trust Co.,* 52 N. D. 752, 204 N. W. 818, 40 A. L. R. 1021; *Dinsmore v. Tidball,* 34 Ohio St. 411; *Hebert v. Lee,*

118 Tenn. 133, 101 S. W. 175, 121 Am. St. 989, 12 L. R. A. (N. S.) 247; *Connecticut Gen. Life Ins. Co. v. Chase*, 72 Vt. 176, 47 Atl. 825, 53 L. R. A. 510; *Willapa Pulp & Paper Mills v. American Employers' Ins. Co.*, 175 Wash. 255, 27 P. (2d) 134.

■ It is also a general rule, which has been invoked frequently by this court, that a corporation is chargeable with constructive notice of facts knowledge of which is acquired by an agent while acting within the scope of his authority. 3 Fletcher Cyclopedia Corporations, § 790; *Gaskill v. Northern Assurance Co.*, 73 Wash. 668, 132 Pac. 643; *Hitt Fireworks Co. v. Scandinavian American Bank*, 114 Wash. 167, 195 Pac. 13, 196 Pac. 629; *Hedrick v. Washington Nat. Ins. Co.*, 186 Wash. 263, 57 P. (2d) 1038.

The rule does not apply, however, when the interest of the officer or agent in the transaction is adverse to the corporation. 3 Fletcher Cyclopedia Corporations, § 819; *Mooney v. Mooney Co.*, 71 Wash. 258, 128 Pac. 225; *German-American State Bank v. Soap Lake Salts Remedy Co.*, 77 Wash. 332, 137 Pac. 461; *Centralia State Bank v. Hackett*, 139 Wash. 394, 247 Pac. 463.

The rule is based upon a presumption that the agent will disclose his knowledge to the corporation. The exception to the rule is based upon a contrary presumption, that the agent, when acting in his own interest, and adversely to the interest of the corporation, will conceal his knowledge. But the exception to the rule does not apply unless the interests of the agent and the corporation are really adverse. 3 Fletcher Cyclopedia Corporations, § 821.

■ The rule and its exception have led to two lines of decisions in actions on fidelity bonds where the fraud is perpetrated by the officer or agent whose fidelity is guaranteed. The following cases hold that the exception to the rule applies, and that knowledge

of the officer procuring the bond, of his own fraudulent acts, is not to be imputed to the corporation: *United States Fidelity & Guaranty Co. v. Muir,* 115 Fed. 264; *Aetna Indemnity Co. v. Haverhill,* 142 Fed. 124; *Fidelity & Deposit Co. of Maryland v. People's Bank of Sanford,* 72 F. (2d) 932; *Hall v. Aetna Casualty & Surety Co.,* 89 F. (2d) 885; *American Indemnity Co. v. Shaw,* 64 S. W. (2d) (Tex. Civ. App.) 367; *Aetna Casualty & Surety Co. v. Local Building & Loan Ass'n,* 162 Okla. 141, 19 P. (2d) 612, 86 A. L. R. 526; *Maryland Casualty Co. v. Tulsa Industrial Loan & Inv. Co.,* 83 F. (2d) 14, 105 A. L. R. 529.

There is, however, a qualification to the exception which is definitely recognized by the supreme court of Oklahoma in the case above cited from that court. The qualification is that,

"Where the agent, though engaged in perpetrating an independent fraudulent act on his own account, *is the only representative of the principal,* his knowledge is imputed to the principal, falling within the general rule imputing knowledge to the principal." (Italics ours.)

The theory upon which the exception to the general rule is applied in the cases cited seems to be either (1) that the officer, in making fraudulent representations or in concealing his previous defalcations, is acting without the scope of his authority, or (2) that the previous defalcations are a part of the same transaction as the fraud perpetrated in procuring the fidelity bond.

The fallacy of this reasoning is pointed out in the cases applying the general rule of imputed knowledge. *West American Finance Co. v. Pacific Indemnity Co.,* 17 Cal. App. (2d) 225, 61 P. (2d) 963 (hearing denied by supreme court); *McIntosh v. Dakota Trust Co.,* 52 N. D. 752, 204 N. W. 818, 40 A. L. R. 1021; *Gordon v.*

*Continental Casualty Co.*, 319 Pa. 555, 181 Atl. 574, 104 A. L. R. 1238. The latter case is so analogous in its facts with the case at bar and so completely refutes the reasoning of the cases holding to the contrary that we feel warranted in quoting from it at unusual length:

"This brings us to the main question in the case: Was the plaintiff at the time the bond was applied for visited with notice of Matthews' defalcation through his knowledge of his own dishonesty? Matthews was, as the testimony clearly shows, the chief executive and managing officer of the bank. He was its secretary and treasurer, its highest salaried officer, giving his full time to its business and affairs. The president was not salaried, but was engaged in other business and did not give his full time to plaintiff's affairs. The directors and president had instructed Matthews to procure the bond and had caparisoned him as the bank's representative in doing so. He was held out as its fit instrument to answer truthfully and fairly the queries which the defendant desired information upon to guide it in deciding whether it would assume the obligation to the bank. As our late brother Mr. Justice Simpson, when the case was here before (311 Pa. 109, 111) clearly stated: 'On the faith of [Matthews'] statements in the application, defendant issued the indemnity bond. . . . Plaintiff, being a corporation, could not personally have any knowledge on this subject [the honesty of its officers]; consequently the language quoted [from the application] could only refer to knowledge of the executive officers, directors, or stockholders of plaintiff, among the first of which was the secretary-treasurer, who, of course, knew that he was an embezzler, yet was seeking to have defendant guarantee his fidelity, which, presumptively at least, it would not do if the fact of that embezzlement was disclosed.'

"Under these circumstances, there would seem to be some confusion of thought in the application of the rule that a principal is not visited with notice through an agent where the agent at the time is acting adversely to his principal and where it would be to the

interest of the agent not to disclose his action or information to the principal. In procuring the bond Matthews was not acting adversely to the bank, but in its behalf. The adverse act of embezzling the money had been consummated previously; in that transaction —the act of embezzlement—his knowledge of his own dishonesty did not carry through him to the bank, because he was then acting adversely to its interests. In arranging for the bond, however, this was not the case. The distinction between the two situations is made clear by reference to *Metropolitan Life Ins. Co.'s App.*, 310 Pa. 17, relied upon by the court below for its conclusion that Matthews' knowledge of his defalcations was not imputable to the trust company. That case, however, does not rule the situation which this record presents, because in that instance Matthews (the same individual as in this one) was acting fraudulently for his own benefit and adversely to the interests of the bank in the very transaction in which the loss to the Metropolitan Company occurred. The latter endeavored to establish in its favor a trust ex maleficio in the trust company of sums of money which the insurance company had paid to the trust company for certain mortgages sold by the trust company to it. In this it was unsuccessful, for it developed that the money paid by the Metropolitan Company and intended for the mortgagors had been stolen by Matthews; since in misappropriating the money Matthews was acting adversely to the interests of the trust company, it was not visited with notice of that fact, and hence not liable as a trustee ex maleficio.

"It is argued by appellant's counsel, and we think convincingly, that the adverse interest exception to the rule that knowledge of a corporate officer is knowledge of the corporation, applies only where a third person seeks to enforce some demand against the corporation (as in the Metropolitan Insurance Company Case), but the exception has no application where the corporation seeks to enforce the benefit of a fraud perpetrated by its officer on a third person; that the exception to the rule of imputed knowledge is not a vehicle for the consummation of fraud. This is in line

with the summing up of the law in the Restatement of the Law of Agency. Section 261 thus enunciates the general rule: 'Agent's position enables him to deceive. A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.' In the comment on the section this appears: 'Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that, from the point of view of the third person, the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.' Section 282: 'Agent acting adversely to principal. (1) A principal is not affected by the knowledge of an agent in a transaction in which the agent is acting adversely to the principal and entirely for his own or another's purposes, except as stated in subsection (2). (2) The principal is affected by the knowledge of an agent although acting adversely to the principal: (a) if the failure of the agent to act upon or to reveal the information results in a violation of a contractual or relational duty of the principal to a person harmed thereby; (b) if the agent enters into negotiations within the scope of his powers and the person with whom he deals reasonably believes him to be authorized to conduct the transaction; or (c) if, before he has changed his position, the principal knowingly retains a benefit through the act of the agent which otherwise he would not have received.' In the comments on this section, the following is stated: 'Meaning of "acting adversely." The mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal's interests.' The illustration given is this: 'A, P's superintendent, knowing that B, a servant working under him, has been stealing from P, and hoping to share B's gains if P can be prevented from becoming suspicious, applies for and receives a surety bond from T, the bond running to P and guaranteeing B's fidelity. T is not

liable to P upon the bond.' In the standard textbook on agency, we find the following: 'So where the act of the agent is apparently within the terms of an express authority, the principal may be bound, although the agent, unknown to the party dealing with him, is secretly engaged in abusing his authority, or has a secret motive to divert the fund either to personal or other illegitimate ends': Mechem on Agency (2d ed.), vol. 2, p. 1309. See also page 1311, section 1728."

Our holding in *Willapa Pulp & Paper Mills v. American Employers' Ins. Co.,* 175 Wash. 255, 27 P. (2d) 134, is in harmony with these views.

Respondent argues that Morrison, for the purpose of inducing investors to entrust their funds to the corporation, represented to them that he would procure a fidelity bond upon himself and other employees. The purport of this argument, as we understand it, is to tie in the fraud perpetrated upon the investors and the fraud perpetrated upon the appellant as one transaction. But we do not regard it as such. The frauds perpetrated upon the investors not only were distinct and separate acts of fraud than that perpetrated on the appellant, but were also different in character.

Furthermore, the bond runs to the corporations as obligees and not to the investors (creditors). The receiver, representing them, has no other or greater right to recover on the bond than the corporations (the obligees) would have had. *Sumner Iron Works v. Wolten,* 61 Wash. 689, 112 Pac. 1109; *Power v. Chadwick,* 166 Wash. 398, 7 P. (2d) 24.

It is elementary that one seeking the benefits of a contract cannot escape its burdens. To secure the bond, upon which the receiver sues, Morrison concealed his previous acts of fraud and dishonesty. This concealment constituted fraud and violated the stipu-

lation in the bond which we have quoted. But for such fraudulent concealment, the appellant would, of course, never have entered into the guaranty of Morrison's fidelity. The contract of guaranty, being induced by fraud, was void from its inception. *Willapa Pulp & Paper Mills v. American Employers' Ins. Co., supra.* To permit the receiver to escape the imputation of knowledge by the "employer" of Morrison's previous acts of fraud and dishonesty would allow him to claim benefits under the bond while repudiating the fraudulent concealment by which appellant was induced to enter into the undertaking.

The causes are remanded, with directions to dismiss.

STEINERT, GERAGHTY, ROBINSON, SIMPSON, and JEFFERS, JJ., concur.

MILLARD, J., dissents.

BEALS, J. (dissenting)—In the majority opinion, the general rule is recognized that, when the interest of the officer or agent of the corporation in a particular transaction is adverse to the principal, the principal is not chargeable with constructive notice of facts within the knowledge of the agent. The reason for the exception to the general rule is well stated in the majority opinion.

It is also true that from this doctrine there have branched two lines of decisions, one, which in my opinion is the majority rule, following the doctrine that, in actions on fidelity bonds, where it appears that the bonded agent was guilty of fraudulent conduct, of which, of course, he knew, his knowledge was not to be imputed to his principal. In the other line of cases, followed by the majority, a contrary conclusion was reached.

After careful consideration, I am convinced that, in the case at bar, this court should follow what I believe

to be not only the majority but the better rule, and that the judgment of the trial court should be affirmed.

For this reason, I dissent from the conclusion reached by the majority.

MAIN, J., concurs with BEALS, J.

