[No. 8718–5–I. Division One. May 24, 1982.]

PUGET SOUND NATIONAL BANK, ET AL, *Respondents*, v.
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, *Appellant*.

*Karr, Tuttle, Koch, Campbell, Mawer & Morrow, John Kruger,* and *Philip Talmadge,* for appellant.

*Johnson, Lane & Gallagher, Joanne Henry,* and *Edward M. Lane,* for respondents.

RINGOLD, J.—This is an appeal and cross appeal from a judgment entered against defendant St. Paul Fire and Marine Insurance Company (St. Paul) in favor of plaintiffs Continental Bank of Burien (the bank) and Puget Sound National Bank.[1] The parties also ask this court to clarify the effect on this judgment of the 1980 change in the legal interest rate. We affirm the judgment of the trial court and decline to apply the new interest rate to a judgment entered before the effective date of the new legislation.

Continental Bank was organized in 1969 as a state–chartered commercial bank. Ralph Dreitzler, Jr. was one of the organizing directors of the bank and served as a director until January 1976. During this time Dreitzler was also president and principal owner of an insurance brokerage

---

[1] On March 19, 1976, Puget Sound National Bank purchased all of the assets of Continental Bank, including an assignment of its right of action in this case.

firm (Dreitzler & Co.). In 1970 Dreitzler proposed and the bank's board of directors approved a program for insurance premium financing. Under the program, which Dreitzler was authorized to set up and supervise, the bank would loan money to Dreitzler's clients for their insurance premiums. Each insured would assign to the bank the right to cancel the insurance policy, as well as the right to the unearned portion of the insurance premium, as security for the loan. In the event of a loan default, the bank could cancel the insurance policy and recoup its loss from the unearned premium in the hands of the insurer. Since the bank was to hold the insurance policies as collateral, it regarded these loans as secured by cash.

Although at first the operations of the program were carried out by the bank's staff interacting directly with the borrowers, by 1974 Dreitzler had set up the procedures so that all contact between the bank and the loan customers channeled through him. Preparation of loan forms, verification of signatures, and monthly payments on many loans were handled by Dreitzler or Dreitzler & Co. employees. Once a loan was booked at the bank the principal amount was deposited into a Dreitzler & Co. account rather than paid directly to the borrowers. Payment coupon books and routine audit notices were also sent directly to Dreitzler. If an account became seriously overdue the bank notified Dreitzler, rather than the borrower. The bank allowed Dreitzler to hold the insurance policies which comprised the collateral for the loans.

Following criticism of these program procedures by state bank examiners in 1974, the bank's board of directors reviewed the procedures and approved certain "safeguards" suggested by Dreitzler: obtaining personal and corporate guaranties from Dreitzler and Dreitzler & Co.; limiting premium financing loans to a maximum duration of 10 months; requiring a down payment of at least 10 percent; and providing for customer credit checks at the option of the bank.

In 1975, the bank obtained two fidelity bonds from St.

Paul, which provided an aggregate coverage of $1,300,000 against losses due to dishonest or fraudulent acts of employees. The bond application was filled out by Dreitzler as the procuring agent and signed by the cashier of the bank. It stated in part that all signatures are obtained in the presence of a bank employee or notary, that all data and collateral are verified as genuine before payout of funds, that coupon payment books are delivered directly to borrowers, and that the bank had not sustained any losses in the previous 6 years.

In 1975 the bank also hired over Dreitzler's objection its first full–time internal auditor. In January 1976, the auditor observed that audit notices for premium financing loan customers were being mailed to Dreitzler instead of to the borrowers themselves. The auditor corrected the addresses and mailed the notices. The response of the "borrowers" revealed that many of the premium financing loans then outstanding were fraudulent. The customers either had no knowledge of such loans or had in fact financed their insurance premiums with the bank through Dreitzler, but in an amount much less than the promissory notes indicated.

The bank filed a proof of loss with St. Paul in February 1976, and in March charged off, as required by state law, the loans which were determined to be uncollectible. *Cf.* RCW 30.04.130. In 1979 the bank obtained a judgment against Dreitzler and Dreitzler & Co. in the amount of $1,201,311.04, plus attorneys fees and interest. After foreclosure of various security interests and sale of Dreitzler's assets, the bank realized a net recovery of $186,735.80 on this judgment.

The present action against St. Paul for recovery under the bonds was commenced in 1977. Following trial in March 1980, the trial court made findings of fact and conclusions of law, denied the bank's request for sanctions under CR 37, and entered judgment for the bank in the amount of $1,352,997. Both parties appeal.

I

COVERAGE OF DREITZLER'S ACTS UNDER THE BONDS

Each bond, allowing for minor differences in language not relevant to the present inquiry, provides for indemnification of Continental Bank "for any loss . . . through any dishonest or fraudulent act of any of the Employees . . ." "Employee" is defined as "one or more of the Insured's officers, clerks and other employees while employed in, at or by any of the Insured's offices . . ."

■ St. Paul first argues that Dreitzler was not an "Employee" of the bank and his acts were therefore not covered by the bonds. We find it unnecessary to decide whether Dreitzler was an "Employee", *i.e.*, a common law employee of the bank, in order to determine whether his fraudulent acts were within the purview of the bonds. To limit coverage to loss caused by "Employees" would ignore the director's exclusionary clause, which excludes coverage for any "loss resulting from any act or acts of any director of the Insured other than one employed as . . . an Employee of the Insured, *except when performing acts coming within the scope of the usual duties of an Employee.*" (Italics ours.) If only "Employees," as defined in the bond, were covered, then the latter part of the exclusion would be superfluous, since the clause already provides coverage for those directors who are "Employees" and excludes those who are not. The latter part of the exclusionary clause, if it is to be given effect at all, must be read as providing coverage for non–"Employee" directors who perform acts ordinarily performed by "Employees" resulting in loss to the bank. Ambiguous exclusionary clauses in insurance policies are construed strictly against the insurer. *Dairyland Ins. Co. v. Ward,* 83 Wn.2d 353, 517 P.2d 966 (1974).

St. Paul next argues that Dreitzler did not perform acts coming within the scope of the usual duties of an "Employee." St. Paul assigns error to the relevant findings and conclusions of the trial court:

During the period from the Spring of 1970 through January 23 of 1976, Ralph Dreitzler prepared forms for the use in the premium loan financing program, made credit determinations on loans to customers, computed down payments and calculated interest and discounts, prepared the notes, insurance premium collateral agreements and notices to insurance companies, obtained signatures of customers on the instruments, caused said loans to be booked at the bank, received the disbursment [*sic*] of loan proceeds through his company account at the Continental Bank of Burien, prepared for mailing and mailed notice of assignment to insurance companies, received verifications for the borrowers for transmittal to them, retained payment books, collected monthly payments on the loans, kept accounting on all payments received and disbursed to the bank in a lump sum the aggregate amounts of these monthly payments just before delinquency each month, held the collateral (being the insurance policies), followed up on delinquencies and obtained and delivered paid in full notes. In performing said functions, this court finds that Ralph F. Dreitzler, Jr. was performing in three capacities: 1) insurance agent; 2) officer of the Dreitzler Corporation; and 3) as an unsalaried employee of the Continental Bank of Burien performing acts coming within the scope of the usual duties of an employee.

Continental Bank had the right to control the program, but left such control entirely in the hands of R. F. Dreitzler, Jr.

Finding of fact 7.

That Ralph F. Dreitzler in performing the acts set forth in the Findings of Fact above was performing acts coming within the scope of the usual duties of an employee . . . and that in said performance committed such dishonest and fraudulent acts alone or in collusion with others so as to come within the coverage of the bonds proximately resulting in the losses sustained by Continental Bank of Burien, therefore causing St. Paul Fire and Marine Insurance Company to be liable upon their bond to said plaintiffs in the amounts hereinafter set forth.

Conclusion of law 3 (as amended by order of April 18, 1980).

■ At trial an expert testified that the usual duties of a bank employee include holding loan collateral and interacting directly with the bank's borrowers in matters relating to their loans such as preparation of documents, distribution of payment books, performance of audits, and the like. The court's determination that Dreitzler was "performing acts coming within the scope of the usual duties of an employee" was supported by substantial evidence and will not be disturbed on appeal. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

St. Paul argues, however, that a finding that Dreitzler performed acts within the scope of duties of a typical bank employee is not enough to trigger the coverage of the bonds, which require that the acts be within the scope of duties of an "Employee." St. Paul contends that since "Employee" is defined by the bonds as an employee *of the insured,* the bank must introduce evidence of a specific Continental Bank employee with the same duties as those performed by Dreitzler.

This contention is without merit. If Dreitzler had not seen to the details of the premium financing program, then some bank employee would have been responsible for those tasks performed, or supposed to be performed, by Dreitzler. The expert testimony was relevant to a factual determination of the usual duties of typical Continental Bank employees, and supported the court's conclusion that Dreitzler performed such duties. The trial court properly concluded that losses due to those acts were within the coverage of the fidelity bonds.

## II
### IMPUTATION OF DREITZLER'S KNOWLEDGE TO THE BANK

St. Paul next argues that the bank had knowledge of Dreitzler's wrongdoing at the time of the bond application, rendering the bonds void from their inception for fraud in the inducement. St. Paul assigns error to the trial court's finding:

That on January 23, 1976 through a routine audit, Continental Bank of Burien first discovered that a loan made in the form of an insurance premium financing loan to a customer of the R. F. Dreitzler Co. under the name of Pelican Packing Co. was a forgery. Subsequent investigation with reference to other loans disclosed that there were 25 other forged, fraudulent, unauthorized or improper loans to customers of R. F. Dreitzler Co. resulting in losses to the Continental Bank of Burien in a sum exceeding $1,300,000.00. Plaintiffs are not chargeable with knowledge of Dreitzler's fraud and dishonesty at any time prior to January 23, 1976, either directly or by imputation.

Finding of fact 9.

█ The trial court's finding of fact, insofar as it relates to the bank's *actual* knowledge, is supported by substantial evidence and will not be disturbed on appeal. *Thorndike.* We agree with St. Paul, however, that the court's finding that the bank had no knowledge of Dreitzler's defalcations *by imputation* is actually a conclusion of law and will be reviewed as such on appeal. *State v. Reader's Digest Ass'n,* 81 Wn.2d 259, 501 P.2d 290 (1972).

The agency rules controlling here are enunciated in *Higgins v. Daniel,* 5 Wn.2d 134, 139, 105 P.2d 24 (1940):

Generally speaking, a principal is chargeable with notice of facts which are within the knowledge of his agent, acquired within the scope of the agent's authority. A well recognized exception to this rule is that, where an agent acquires information which it would be to his advantage to conceal from his principal, it is assumed that he did not impart such knowledge to his principal, and accordingly knowledge would not be imputed to the principal. This exception, however, is qualified by the rule that, if the agent is the sole representative of the principal, or the only person or means by which the principal acts, then the knowledge of the agent will be imputed to the principal, and the general rule applies, and not the exception thereto. 4 Zollman, Banks and Banking, 352, §§ 2322–3–4; 9 C. J. S. 431, § 203 *et seq.; Mays v. First State Bank,* 247 S. W. (Tex. Com. App.) 845.

It is undisputed that Dreitzler's defalcations were in his

own interest and adverse to the interests of the bank. St. Paul argues, however, that (1) Dreitzler was the "sole representative" of the bank with respect to the premium financing program, so that his knowledge must be imputed even though he acted adversely; and (2) regardless of the adverse nature of the defalcations, Dreitzler was acting in the bank's interests in obtaining the bonds for the bank, so his knowledge, including his knowledge of his wrongdoing, should be imputed to the bank as of the time of the bond application. *See Post v. Maryland Cas. Co.,* 2 Wn.2d 21, 97 P.2d 173 (1939).

## A
### *"Sole Representative" Doctrine*

██ Even if the agent's interest is adverse to that of his principal, knowledge will be imputed if the agent is the "sole representative" of the principal. *Higgins; Plywood Mktg. Assocs. v. Astoria Plywood Corp.,* 16 Wn. App. 566, 558 P.2d 283, 96 A.L.R.3d 1231 (1976). As the court stated in *Gates v. Gregory,* 91 Wash. 151, 156, 157 P. 470 (1916), "The principal is regarded as acting with knowledge of a fraudulent act when represented solely by an agent who possesses such knowledge."

Whether Dreitzler acted as the bank's "sole representative" with respect to the premium financing program is a question of fact, concerning which the trial court made no finding. The silence of the trial court on a material[2] issue of fact must be interpreted as a finding against the party who bears the burden of proof on that issue. *Golberg v. Sanglier,* 96 Wn.2d 874, 639 P.2d 1347, 647 P.2d 489 (1982); *Batten v. Abrams,* 28 Wn. App. 737, 626 P.2d 984 (1981). St. Paul bears the burden of establishing facts rele-

---

[2]We assume without deciding that this factual issue is material and consequently do not reach the issue of what effect charging the bank with Dreitzler's knowledge would have on the validity of the bonds. We note that the fidelity bonds at issue contain the following clause: "No statement made by or on behalf of the Insured shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement." The bond application was signed by the cashier of the bank, not by Dreitzler.

vant to its defense of fraud. *See generally Cerkonek v. Dibble,* 42 Wn.2d 451, 256 P.2d 488 (1953).

The record contains substantial evidence sufficient to sustain a finding that Dreitzler was not the "sole representative" of the bank with respect to the premium financing program. The program itself was subject to review by the Continental Bank board of directors, who revised the program procedures in 1974. A bank loan officer did the actual booking of the loans and could have questioned Dreitzler's actions but did not. Bank employees prepared the audit notices for the loans, though they were mailed to Dreitzler. Since Dreitzler was not a "sole representative," knowledge acquired while he acted adversely to the bank's interests will not be imputed to the bank.

## B
### Procurement of the Bonds; the Post Doctrine

We reject St. Paul's contention that *Post v. Maryland Cas. Co., supra,* requires the imputation of Dreitzler's wrongdoing to the bank merely because Dreitzler obtained the fidelity bonds. In *Post* the wrongdoer, Morrison, was president of two corporations which he "owned, managed, and manipulated . . . to swindle friends, acquaintances, and strangers." *Post,* at 22. He procured a surety bond guaranteeing his fidelity to the corporations and did not reveal his prior defalcations to the surety. After the corporations went into receivership, an action was brought on the bonds. The trial court entered judgment on a jury verdict against the surety. The surety appealed. *Post,* at 22–24.

The Supreme Court stated as a general rule that misrepresentations by the corporation would release the surety from its obligations, and the ultimate issue became whether Morrison's knowledge of his own wrongdoing would be imputed to the corporations so as to void the bonds. The court discussed the general agency rule on the imputation of knowledge and the "sole representative" exception, and reviewed two lines of decisions applying these rules in the

context of a fidelity bond application. The majority rule is that the adversity of the agent's interests with respect to his wrongdoing continues to exist even when the agent subsequently performs acts which are in the interests of the corporation; it is not presumed that the agent would ever choose to inform his principal of his prior wrongdoing. *See, e.g., Maryland Cas. Co. v. Tulsa Indus. Loan & Inv. Co.,* 83 F.2d 14, 105 A.L.R. 529 (10th Cir. 1936). The minority rule distinguishes between the prior defalcations and the later bond application, and holds that if the agent is not acting adversely to the principal in applying for the bond, his knowledge, including that of his prior wrongdoing, will be imputed to his principal. *See, e.g., Gordon v. Continental Cas. Co.,* 319 Pa. 555, 181 A. 574, 104 A.L.R. 1238 (1935). The court in *Post* quoted extensively from *Gordon,* imputed Morrison's knowledge to his corporations, and remanded the case with directions to dismiss. *Post,* at 27–32.

■ Implicit in the imputation of knowledge in *Post* was a necessary determination that Morrison either (1) was not acting adversely to the corporate interests when he procured the bonds or (2) was acting adversely but also was the "sole representative" of the corporations. One of the foregoing conditions must have been present in order that knowledge be imputed at all. *Higgins.*

In contrast to the situation in *Post,* Dreitzler was not in control of his principal. The best interests of Dreitzler and Continental Bank could, and did, diverge. Dreitzler's concealment of his wrongdoing on the bond application was not in the best interests of the bank.

Neither can we say that Dreitzler was the "sole representative" of the bank with respect to the bond application. The bank had a board of directors at whose instance Dreitzler applied for the bonds. While Dreitzler may have filled out the application and submitted it to St. Paul, it was signed by an officer of the bank who had no knowledge of Dreitzler's wrongdoing.

Under these facts, the rule set forth in *Post* does not

apply. Dreitzler was not the alter ego of the bank; he acted adversely both as to his defalcations and as to his concealment of them on the bond application. His motive to conceal continued throughout the period in question, and he was not the sole representative of the bank. His knowledge is, therefore, not imputed to the bank; the trial court did not err.[3]

## III
### CALCULATION OF DAMAGES UNDER THE BONDS

The bank ultimately identified 26 allegedly fraudulent premium financing agreements. Prior to trial the parties agreed to limit the scope of the action to 19 particular transactions and at trial the bank further limited its claim to 16 transactions. A Continental Bank vice–president testified to the aggregate balance outstanding on the 16 loans as of the charge–off dates including interest accrued to the date of charge–off. Continental Bank charged off this amount. The trial court granted the bank recovery in the amount charged off for the 16 loans, plus prejudgment interest at 6 percent, minus the net recovery from Dreitzler.

The parties raise five issues with regard to the calculation of damages. St. Paul argues that the court erred (1) in basing its calculation of damages on the amount charged off by the bank rather than on the amount deposited to Dreitzler's account; (2) in permitting the bank to recover interest accrued to the date of charge–off; (3) in allowing prejudgment interest to the bank; and (4) in calculating prejudgment interest on the gross charge–off amount rather than first reducing that amount by the recoveries from Dreitzler. The bank argues that the trial court should have credited the recoveries from Dreitzler against two other fraudulent loans not within the scope of the action before applying them to the loss recoverable under the bonds.

---

[3]In view of our disposition of this issue, we do not consider the further complication presented by the bank's contention that Dreitzler was St. Paul's agent in procuring the fidelity bonds so that Dreitzler's knowledge of his own defalcations should be imputed to St. Paul.

A

*The "Actual Loss Sustained"*

The proceeds of 9 of the 16 loans at issue, after discounting, were deposited in full to Dreitzler's account. The proceeds of the other 7 loans were first applied to cancel prior premium financing indebtedness of the "borrowers" with the remainder being deposited to Dreitzler. Total deposits to Dreitzler's account were approximately $1,050,000; approximately $350,000 was credited to pay off prior indebtedness. All of the prior loans which were paid off in this manner, as well as the 16 loans forming the basis of the bank's claim, were shown at trial to have been fraudulently obtained.

St. Paul contends that the measure of damages under a fidelity bond is the actual out–of–pocket loss to the bank, represented here by the amounts deposited to Dreitzler's account for the 16 loans. St. Paul argues that any loss attributable to paying off prior indebtedness was actually incurred at the time the prior loans were made, the subsequent cancellation and charge–off being merely a book-keeping entry.

█ A fidelity bond covers only actual, as opposed to theoretical, losses. *Continental Cas. Co. v. First Nat'l Bank,* 116 F.2d 885 (5th Cir. 1941). St. Paul did not present any evidence tending to contradict the fact of actual loss, and the weight of the evidence supports the trial court's determination that the bank incurred loss in the amounts charged off. Even if the "actual" loss to the bank occurred at the time of the earlier loan, *see, e.g., Employers' Liab. Assur. Corp. v. State ex rel. Union Trust Co.,* 110 Ind. App. 86, 34 N.E.2d 936 (1941), we fail to see how the loss is any less compensable under the bonds. As conceded by St. Paul at argument, the bonds covered loss sustained by the bank at any time but discovered during the bond period. Neither does the limitation of the scope of action to 16 particular transactions compel a contrary result. The amounts in question were charged off by the bank as part of the loss attributable to the 16 loans at issue. The mea-

sure of damage of the "actual loss" to the bank is the aggregate outstanding balance due on the accounts representing the 16 transactions. *See Miami Nat'l Bank v. Pennsylvania Ins. Co.*, 314 F. Supp. 858 (S.D. Fla. 1970). The trial court did not err.

## B
### Accrued Interest

St. Paul contends that the bank's "actual loss" does not include accrued but unpaid interest on the loans to the date of charge-off. St. Paul cites *Lincoln Cy. v. Gibson*, 143 Wash. 372, 255 P. 119 (1927), for the proposition that interest runs from the date of demand on the surety. That case, however, concerned the question of prejudgment interest, not accrued interest on a loan. *See Grand Lodge v. United States Fid. & Guar. Co.*, 2 Wn.2d 561, 98 P.2d 971 (1940).

■ The intent of the parties controls as to whether the bonds cover the loss of interest accrued but not paid on the fraudulent notes. *See National Bank v. Aetna Cas. & Sur. Co.*, 161 Wash. 239, 296 P. 831 (1931). The bonds provide only for indemnification of "loss sustained" by the insured. Construing the ambiguous term "loss sustained" most strictly against St. Paul, *see Dairyland Ins. Co. v. Ward*, 83 Wn.2d 353, 517 P.2d 966 (1974), we cannot say that compensation for the loss of expected interest payments was not within the contemplation of the parties to the bond. St. Paul did not introduce evidence of any contrary intent at trial. The actual loss sustained by the bank therefore included more than just the principal outstanding on the loans. The trial court did not err in basing the recovery on the amount charged off by the bank, including accrued interest.

## C
### Prejudgment Interest

■ We next consider St. Paul's contention that the award of prejudgment interest was improper, because the amount of loss was neither liquidated nor ascertainable

with reference to a fixed standard in the contract without reliance on opinion or discretion. *Prier v. Refrigeration Eng'g Co.,* 74 Wn.2d 25, 442 P.2d 621 (1968). The amount of loss compensable under the bonds was the account balance outstanding on the date of charge–off, including accrued interest. *Miami Nat'l Bank, supra.* This amount is readily ascertainable without reliance on either opinion or discretion. *See Plywood Mktg. Assocs. v. Astoria Plywood Corp.,* 16 Wn. App. 566, 577–78, 558 P.2d 283, 96 A.L.R.3d 1231 (1976). The trial court properly awarded prejudgment interest.

## D
### *Calculation of Prejudgment Interest Prior to Crediting Recoveries*

St. Paul next contends that the trial court erred by calculating prejudgment interest on the gross amount of loss before first subtracting the recoveries from Dreitzler, arguing that this resulted in double recovery of prejudgment interest by the bank. The record shows, however, that St. Paul was properly credited for interest on the funds recovered from Dreitzler, in the amount of $16,463.66, covering the time from the recovery to June 30, 1979.

## E
### *Application of Recoveries From Dreitzler*

Finally, the bank contends that the net recovery from Dreitzler should have been reduced by some $47,000 prior to applying it to the covered loss, due to losses attributable to two other allegedly fraudulent loans which were not among the 16 loans at issue at trial. This argument, unsupported by authority, was rejected by the trial court when first argued by the bank in a memorandum filed a month after entry of judgment. The rule in *State v. Kroll,* 87 Wn.2d 829, 838, 558 P.2d 173 (1976), controls: "Assignments of error unsupported by citation [of] authority will not be considered on appeal unless well taken on their face."

## IV
### AMENDMENT OF RCW 4.56.110

The judgment, filed April 4, 1980, provided that it would "bear interest at the legal rate from the date hereof until paid." The "legal rate" at the time of judgment was 8 percent. Laws of 1969, ch. 46, § 1, p. 112; RCW 4.56.110. Effective May 1, 1980, the Legislature amended RCW 4.56-.110 to provide:

> Interest on judgments. Interest on judgments shall accrue as follows:
>
> (1) Judgments founded on written contracts, providing for the payment of interest until paid at a specified rate, shall bear interest at the rate specified in such contracts, not in any case, however, to exceed twelve percent per annum: *Provided,* That said interest rate is set forth in the judgment.
>
> (2) Except as provided under subsection (1) of this section, judgments shall bear interest at the rate of ten percent per annum from the date of entry thereof . . .

Laws of 1980, ch. 94, § 5, p. 297. The bank argues that the judgment should bear interest at the rate of 8 percent per annum from the date of entry to April 30, 1980, and at the rate of 10 percent per annum from May 1, 1980, until paid.

 We recognize that a legislative body may provide that a new interest rate will apply to existing judgments as well as those entered after the act's effective date, the right to such interest being not contractual but a matter of legislative discretion. *Palmer v. Laberee,* 23 Wash. 409, 63 P. 216 (1900). The Legislature, however, did not expressly so provide. The language of the act is clear. By providing that the interest rate as amended will apply to a judgment "from the date of entry thereof," the Legislature manifested an intent that the new interest rate apply only to judgments entered after the act's effective date. The interest rate on the judgment against St. Paul is controlled by the statute in effect at the time of the entry of the judgment and continues at 8 percent per annum.

## V
### REQUEST FOR SANCTIONS

Finally, the bank contends that the trial court should have granted sanctions against St. Paul under CR 37(c) based on its failure to admit certain facts prior to trial. Because the requests for admission denied by St. Paul called for the concession of either legal conclusions or major facts central to the lawsuit, a negative answer to these questions was proper, and the trial court did not err in refusing to grant sanctions. *Reid Sand & Gravel, Inc. v. Bellevue Properties,* 7 Wn. App. 701, 502 P.2d 480 (1972).

The judgment is affirmed. We deny the bank's request for attorney fees on appeal.

ANDERSEN, C.J., and DURHAM, J., concur.

Reconsideration denied July 1, 1982.

Review denied by Supreme Court October 8, 1982.